UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:

PONDEROSA ENERGY, LLC, and
GS ENERGY, LLC

                           Debtor.
------------------------------------------------------------x

Chapter 11

Case No. 17-_____ (___)

(Joint Administration Requested)

## Chapter 11 Debtors' Affidavit

1.      My name is Richard Sands. I am over 21 years old. I am the authorized representative of Ponderosa Energy LLC ("Ponderosa") and GS Energy LLC ("GSE," and, together with Ponderosa, the "Debtors"). I make this declaration based on my personal knowledge of the Debtors and their operations, as well as from information I have gathered from individuals working for me on behalf of the Debtors.

## Information Required by BLR 1007-2

**(a)(1)  Nature of the Debtors and these cases**

2.      The Debtors are oil and gas exploration and production companies. Their primary assets are oil and gas leases in Texas. Their primary place of business is their headquarters in Manhattan from which the operations of the Debtors are administered.

3.      In 2016, Ponderosa and GSE entered into secured financing arrangements with PPF 2 LLC ("PPF2") and PPF 3 LLC ("PPF3"), respectively, for a total of approximately $4.61 million. The loans were structured as volumetric production payments, or VPPs. Under this structure, instead of fixed cash payments, the lender is entitled to the monthly revenue from a fixed quantity of future oil production. Although the borrow retains the burdens of ownership of the oil and the lender takes a lien on the oil, the VPP documents themselves recite that the oil is

**Debtors' Chapter 11 Declaration**                                                                1

"conveyed" to the lender at the time the facility is funded. In this way, secured loan financing under a VPP is disguised as a sale of property. This is designed to skirt usury laws.

4. PPF marketed the VPP structure aggressively in its negotiations with the Debtors. PPF repeatedly claimed that the cost of borrowing under the VPP would be lower than through alternative asset-backed loan arrangements. The VPP structure was extremely one-sided. On the one hand, the VPP structure did not call for fixed cash payments, but instead purported to convey to PPF future oil production on a monthly basis. This meant that if the price of oil increased significantly, PPF would reap extraordinary gains and the Debtors would be forced to bear usurious borrowing costs. On the other hand, the VPP also gave PPF a security interest in the Debtors' oil and gas assets that would allow PPF to foreclose, just like any other secured lender, in the event that oil production was less than anticipated.

5. Aware of the potential for abuse in this structure, the Debtors demanded price protection. PPF agreed to a rebate mechanism. If the oil was sold at a price above $28 per barrel, PPF would rebate 75% of the proceeds above that price to the Debtors. For example, if PPF were entitled to revenue from the sale of 1,000 barrels of oil in a given month, and the oil was sold that month for $50 per barrel, PPF would refund to the Debtors $22,000 (or .75 x 1,000 x (50-28)). The rebate thus ensured that PPF would not gain an unfair windfall from an increase in oil prices.

6. John Lane, one of PPF's agents in the negotiations of the VPPs, explained to the Debtors that, with the rebates, the effective interest rate on the financing was competitive with other asset-backed loans which, at that time, typically carried 4.5% interest.

7. In 2017, despite heavy investment by the Debtors into their properties, oil production from the Ponderosa leases was less than anticipated. At the same time, PPF actively

**Debtors' Chapter 11 Declaration**                                                                                                    2

interfered with the Debtors' oil production and undermined their ability to perform under the financing arrangements by, among other things: (a) soliciting the Debtors' personnel and contractors; (b) telling the Debtors' vendors and employees that they intended to foreclose on the Debtors' leases; (c) failing to provide balances of the debt outstanding; (d) refusing to provide an accurate accounting of the number of barrels of oil delivered and sold, thus making it impossible for the Debtors themselves to determine the amount of debt outstanding; and (e) preventing the Debtors from further investing in the properties by threatening foreclosure, and doing so without given any prior notice of any alleged default.

8. In addition to this interference with the Debtors' operations, PPF breached the terms of the secured financing by noticing foreclosure without giving prior notice of an alleged default and by refusing to pay millions in dollars of rebates owed to the Debtors on account of the high price of oil. The Debtors approached PPF numerous times in an effort to negotiate a settlement, but PPF made the negotiations impossible by refusing to provide the Debtors with an outstanding balance or an accounting of the barrels of oil produced and sold.

9. In short, PPF has engaged in fraudulent, tortious and usurious predatory lending. PPF promised the Debtors a structured financing arrangement at a competitive cost of borrowing and a rebate mechanism to prevent overcharging in case the price of oil increased. In reality, PPF set the Debtors up to fail. PPF interfered with their operations, making it impossible for the Debtors to meet production targets; refused to pay millions of dollars in rebates; and abused the VPP structure itself – which ostensibly transferred only a portion of the Debtors' future oil production – in an attempt to seize all of the Debtors' assets in a foreclosure.

10. The Debtors have filed these chapter 11 cases to halt the foreclosure and provide an efficient forum for resolving their claims against PPF and restructuring their businesses.

**Debtors' Chapter 11 Declaration**                                                                                                                    3

**(a)(2) Trustees and committees in cases under chapter 7 or 13**

11.  These are chapter 11 cases. There are no trustees or creditors' committees.

**(a)(3) Committee contact information**

12.  There were no committees organized prior to the order for relief.

**(a)(4) 20 largest creditors**

13.  Creditor information is included in the disclosures of the 20 largest creditors filed for each of the Debtors in these cases.

**(a)(5) Secured creditors**

14.  Ponderosa has one secured creditor. The creditor is PPF 2 LLC ("PPF2"). The contact for this lender is Davis Martin, 400 N. St. Paul, Suite 505, Dallas, Texas 75201, telephone 214-468-8606. The amount of the claim is in dispute. The amount of the loan facility was approximately $2.51 million. A portion has been repaid, and any outstanding balance is subject to substantial offsets. The loan is secured by a lien on Ponderosa's mineral leases. The estimated value of these assets is $7.5 million.

15.  GSE has one secured creditor. The creditor is PPF 3 LLC ("PPF3"). The contact for this lender is Davis Martin, 400 N. St. Paul, Suite 505, Dallas, Texas 75201, telephone 214-468-8606. The amount of the claim is in dispute. The amount of the loan facility was approximately $2.1 million. A portion has been repaid. The loan is secured by a lien on Ponderosa's mineral leases. The estimated value of these assets is $7.5 million.

**(a)(6) Summary of assets and liabilities**

16.  Ponderosa's assets consist of a portfolio of oil and gas leases in Texas. These have an estimated value of $7.5 million. Ponderosa also has cash on hand and sundry

receivables of less than $100,000. Ponderosa earns substantial cash revenue from the sale of oil and gas produced from Ponderosa's leases.

17. Ponderosa's liabilities consist of a secured debt to PPF2 in an amount that is in dispute. Ponderosa owes unsecured liabilities related to hedging contracts of approximately $680,000. Ponderosa has trade payables to vendors of less than $100,000.

18. GSE's assets consist of a portfolio of oil and gas leases in Texas. These have an estimated value of $7.5 million. GSE also has cash on hand and sundry receivables of less than $100,000. GSE earns substantial cash revenue from the sale of oil and gas produced from GSE's leases.

19. GSE's liabilities consist of a secured debt to PPF3 in an amount that is in dispute. GSE has an unsecured debt from a prior financing in the amount of approximately $359,000. GSE has trade payables to vendors of approximately $600,000.

### (a)(7) Equity interests

20. Ponderosa is an LLC. 100% of the membership interests are owned by Ponderosa Energy Holdings LLC.

21. GSE is an LLC. 100% of the membership interests are owned by RNP LLC, a Delaware limited liability company.

### (a)(8) Property held by custodians

22. None of the Debtors' property is held by a custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor.

**(a)(9) Premises**

23.     Both Debtors conduct their business out of leased office space at 745 Fifth Avenue, New York City, New York 10151. The Debtors also derive income from their oil and gas leases.

**(a)(10) Location of assets, books and records and assets held abroad**

24.     The Debtors books and records are held at their offices in New York. The Debtors' primary assets are the oil and gas leases located in Texas. The Debtors do not hold any assets abroad.

**(a)(11) Pending litigation**

25.     PPF2 and PPF3 have wrongfully initiated foreclosure proceedings in Texas against the Debtors. This process was notices as a substitute trustee's sale, and there is no pending court proceeding.

26.     PPF2 and PPF3 have also initiated litigation against the Debtors and others in *Petroleum Prod. Fin., Inc. v. GS Energy, LLC*, Cause No. DC-17-04608 (Dist. Ct. Dallas Cty. Texas). That litigation is pending, but no judgment of seizure of the Debtors' property is anticipated imminently.

**(a)(12) Management**

27.     Richard Sands is the head of the management team for both Debtors. In addition to overseeing operations, he is also responsible for financing activities. Richard Sands is resident in New York City and works at the Debtors' offices on Fifth Avenue. Richard Sands also provides financial, managerial and administrative services to the Debtors through his role at Casimir Resources Advisors LLC ("CRA").

28. Adam Sands provides administrative support is primarily responsible for the operational activities of the Debtors. Adam is resident in New York City and works at the Debtors' offices on Fifth Avenue.

29. William Poon provides financial, human resources and administrative services to the Debtors. These services are provided through William Poon's role at CRA.

30. The Debtors compensate CRA from time to time for the benefit of the services provided by CRA, including services provided by Richard Sands and William Poon.

**(b)(1) Payroll**

31. Weekly payroll to employees (exclusive of officers, directors, stockholders and partners) for the 30-day period following the filing of the chapter 11 petitions will be approximately $3,550 for Ponderosa.

**(b)(2)(A) Payments to officers of a corporation**

32. Neither of the Debtors is a corporation.

**(b)(2)(B) Payments to owners of a partnership**

33. The Debtors are both LLC that are 100% owned by other entities. No payments are anticipated to be made to the owners during the 30 days following the filing of the chapter 11 petitions.

**(b)(2)(C) Payments to consultants**

34. The Debtors have not retained financial consultants. The Debtors have an existing management relationship with CRA whereby CRA personnel provide administrative services. No payments under the CRA relationship are anticipated for the 30 days following the filing of the chapter 11 petitions. The Debtors also consult from time to time with Cory

**Debtors' Chapter 11 Declaration**                                                                                                       7

Meadows, an oil and gas professional resident in Texas. Cory's fees are paid by the operator of the Ponderosa leases and not by either of the Debtors.

**(b)(3) 30-day cash budget**

35. This information will be filed separately as part of an operating cash budget.

## Additional Background Information

**Ponderosa**

36. Ponderosa is a Delaware limited liability company formed on April 15, 2015. Ponderosa is wholly owned by Ponderosa Energy Holdings LLC, a Nevada limited liability company of which I am an authorized representative.

37. Ponderosa is in the oil and gas business. Ponderosa holds working interests in mineral leases located in Carson, Gray and Hutchinson counties in Texas (the "Ponderosa Assets").

38. Ponderosa's principal place of business is its headquarters at 745 Fifth Avenue, New York City, New York 10151. Ponderosa administers its assets from this headquarters. Ponderosa does not directly operate any of its leases. Ponderosa's leases are operated by Ponderosa TX Operating LLC, a non-debtor entity.

39. Ponderosa has three employees. Two of those employees are in New York. The third employee is in Houston. The employees are paid through a payroll administrator. Ponderosa pays approximately $7,100 on a semi-monthly basis to a payroll company called Insperity, Inc., who in turn handles withholding, salary payments and insurance payments.

40. Ponderosa maintains a single bank account at Signature Bank in New York.

**GS Energy**

41. GSE is a Delaware limited liability company formed on September 13, 2016. GSE is wholly owned by RNP, LLC, a Delaware limited liability company of which I am an authorized representative.

42. Like Ponderosa, GSE is in the oil and gas business. GSE holds working interests in mineral leases located in Carson, Moore and Hutchinson counties in Texas (the "GSE Assets").

43. GSE's principal place of business is its headquarters at 745 Fifth Avenue, New York City, New York 10151. GSE administers its assets from this headquarters.

44. GSE maintains a single bank account at Signature Bank in New York.

**The Ponderosa Financing**

45. In 2016, Ponderosa began negotiations to explore funding options to finance development projects, remedial projects and acquisitions to expand production.

46. PPF2 and Ponderosa explored several financing structures, including reserve based lending and other forms of secured financing. PPF2 eventually proposed a structure called a volumetric purchase payment, or VPP.

47. Under the VPP, PPF2 would ostensibly "buy" a portion of Ponderosa's future oil production in exchange for an up-front payment. Although Ponderosa's leases produce both gas and oil, the VPP would apply only to oil production.

48. In substance, this was a secured financing. PPF2 did not actually want oil. In fact, PPF2 lacked any facilities or equipment that would be necessary receive oil. Instead, it wanted cash payments on a monthly basis based on the anticipated future production of oil. If

**Debtors' Chapter 11 Declaration**                                                                                     9

those payments were not made, PPF2 would have the option to foreclose on the oil, just like a secured lender.

49. Throughout the negotiations, PPF2 consistently represented the VPP structure as just another type of secured lending. PPF2 aggressively sold the VPP structure, repeatedly claiming that it would be less expensive than traditional asset-based lending structures.

50. On October 11, 2016, Ponderosa and PPF2 agreed on a VPP (the "Ponderosa Financing") and signed four related instruments. A Purchase and Sale Agreement ("Ponderosa PSA") set the "purchase price" of future oil production at approximately $2.51 million in exchange for "a non-operating, non-expense-bearing, limited overriding royalty interest in and to the Subject Interests (being real property interest), free of all cost, risk and expense of production, operations, processing and delivery to the Delivery Point."

51. The "royalty interest" ostensibly entitled PPF2 to 90% of the oil produced by Ponderosa's leases until PPF2 had received a total of 75,000 barrels of oil from the leases. Ponderosa was required to use its "best efforts" to cause the leases to produce at 2,000 barrels of oil per month through June 2019, and then 1,000 barrels of oil per month thereafter.

52. As with other financings disguised as sales, the Ponderosa PSA required that Ponderosa – and not PPF2, the ostensible "buyer" – would retain all the burdens of ownership, including tax and insurance obligations. The Ponderosa PSA specifically provided that the royalty interest conveyed "shall at all times be treated for federal income tax purposes . . . as a mortgage loan." Nevertheless, the parties also executed a Conveyance of Term Overriding Royalty Interest and a Deed of Trust that purported to grant PPF2 a security interest over the interests in the mineral leases, including those portions ostensibly already conveyed to PPF2 under the "conveyance" instrument.

**The GSE Financings**

53. Soon after the Ponderosa Financing closed, GSE sought to enter into a similar funding arrangement. As with the Ponderosa Financing, the GSE VPP would only apply to oil production, even though GSE's leases produced both gas and oil.

54. GSE was skeptical, however, that the VPP structure of the Ponderosa Financing was unduly burdensome and could lead to excessive borrowing costs. If the price of oil increased, Ponderosa's monthly payments to PPF2 might far exceed any reasonable rate of return on the loan. At the time, oil prices were in the mid-$30s per barrel and the barrels ostensibly purchased through the VPP structure were priced at the mid-$20s per barrel. Indeed, PPF2 stood to make an extraordinary return on its loan well in excess of 40% per annum.

55. To remedy this situation, GSE insisted that its VPP include a rebate mechanism. If oil were sold at a price higher than $28 per barrel, the lender would be required to rebate 75% of the revenue earned over that price. This way, if the price of oil went up, GSE would receive a fair share of the up side and the cost of borrowing would not become excessive. The lender would still be entitled to upside, but GSE could be comfortable that the financing would still be fair and equitable to both parties.

56. On or about December 1, 2016, GSE entered into a secured financing arrangement with PPF3 (the "GSE Financing"). PPF3 is an affiliate of PPF2. The same individuals who were involved in the Ponderosa Financing negotiated the GSE Financing.

57. The documentation of the GSE Financing was similar to the documents used in the Ponderosa Financing. GSE and PPF3 entered into a Purchase and Sale Agreement (the "GSE PSA") under which PPF3 loaned $2.1 million to GSE. The GSE PSA described the loan as the "purchase" of a "royalty interest" in oil produced from GSE's leases. The parties also executed a

conveyance agreement and a security agreement that granted PPF3 a lien over all of GSE's interests in the leases, including those interests ostensibly already conveyed to PPF3.

58. The GSE Financing included the rebate mechanism. In fact, as an inducement to GSE to enter into the GSE Financing, PPF3 caused PPF2 to offer the same rebate mechanism to the Ponderosa Financing. The inducement was effective because GSE and Ponderosa have common ownership.

59. Despite an express agreement regarding the rebate mechanism, PPF2 and PPF3 dragged their feet on the documentation, and ultimately reneged on the commitment altogether.

60. Between October 2016 and March 2017, Ponderosa made its best efforts to produce oil from its leases, but was unable to produce the 2,000 barrels per month anticipated under the Ponderosa Financing. Despite this shortfall in production, Ponderosa made a series of good faith payments over and above the sale proceeds from the oil actually produced.

61. Despite receiving the good faith payments, PPF2 called the "Ponderosa Mortgage" and sought to foreclose on Ponderosa's leases without providing any notice of default. The foreclosure proceedings precipitated these chapter 11 filings.

62. Unlike Ponderosa, GSE was able to meet its production targets. Nevertheless, without any notice of an alleged default, PPF3 initiated foreclosure proceedings against GSE's assets as well, precipitating these chapter 11 filings.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 4, 2017.

_____
Richard Sands