DICONZA TRAURIG KADISH LLP
630 Third Avenue
New York, New York 10017
Allen G. Kadish
Harrison H.D. Breakstone
Telephone: (212) 682-4940
Facsimile: (212) 682-4942
Email:  akadish@dtklawgroup.com
         hbreakstone@dtklawgroup.com

Hearing Date:  January 17, 2018
Hearing Time:  2:00 p.m.

JACKSON WALKER LLP
2323 Ross Ave., Suite 600
Dallas, Texas 75201
Michael S. Held
Brian A. Kilpatrick
Telephone: (214) 953-6000
Facsimile: (214) 953-5822
Email:  mheld@jw.com
         bkilpatrick@jw.com

*Counsel for Petroleum Production Finance, Inc.,
PPF 2 LLC and PPF 3 LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

In re:                                              Chapter 11

PONDEROSA ENERGY, LLC, and                          Case No. 17-13484-SHL
GS ENERGY, LLC,                                     (Jointly Administered)

              Debtors.

-----------------------------------------------------------x

## NOTICE OF HEARING ON
## MOTION TO TRANSFER VENUE OF THESE
## CASES TO THE NORTHERN DISTRICT OF TEXAS

        PLEASE TAKE NOTICE that PETROLEUM PRODUCTION FINANCE, INC., PPF 2 LLC

and PPF 3 LLC (collectively, the "PPF Parties"), by their counsel, DICONZA TRAURIG KADISH

LLP, file the annexed Motion (the "Motion"), pursuant to 28 U.S.C. § 1412 and Rule 1014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order transferring venue of

these chapter 11 cases and all related adversary proceedings to the United States District Court for the Northern District of Texas, in the interest of justice and for the convenience of the parties.

PLEASE TAKE FURTHER NOTICE that a hearing to consider the Motion will be held before the Honorable Sean H. Lane, United States Bankruptcy Judge, in Courtroom 701, at the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, on Wednesday, January 17, 2018, at 2:00 p.m. (the "Hearing Date"), or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be writing, shall conform to the Bankruptcy Code, the Bankruptcy Rules and Local Rules of the Bankruptcy Court, shall set forth the name of the objecting party, the basis for the objection, and the specific grounds therefor, and shall be filed with the Bankruptcy Court with a copy delivered to the chambers of the Bankruptcy Judge, and served in accordance with General Order M-399, and served upon (i) DiConza Traurig Kadish LLP, Attn: Allen G. Kadish Esq., 630 Third Avenue, New York, New York 10017; (ii) Jackson Walker LLP, Attn: Michael S. Held, Esq. and Brian A. Kilpatrick, Esq., 2323 Ross Ave., Suite 600, Dallas, Texas 75201, and (iii) the Office of the United States Trustee, Attn: Serene Nakano, Esq., 201 Varick Street, New York, New York 10014, so as to actually be filed with the Bankruptcy Court and received by the parties listed above no later than Wednesday, January 10, 2018.

PLEASE TAKE FURTHER NOTICE that if no objection is timely filed and received, the Bankruptcy Court may approve the Motion on the Hearing Date.  Objecting parties are required to attend on the Hearing Date and failure to appear may result in relief being granted or denied upon

2

default.

Dated: New York, New York                    DICONZA TRAURIG KADISH LLP
         December 22, 2017


                                             By:    s/ Allen G. Kadish
                                                 Allen G. Kadish
                                                 Harrison H.D. Breakstone
                                             630 Third Avenue
                                             New York, New York 10017
                                             Telephone: (212) 682-4940
                                             Facsimile: (212) 682-4942
                                             Email:  akadish@dtklawgroup.com
                                                     hbreakstone@dtklawgroup.com

                                             and

                                             Michael S. Held
                                             JACKSON WALKER LLP
                                             2323 Ross Ave., Suite 600
                                             Dallas, Texas 75201
                                             Telephone: (214) 953-5859
                                             Facsimile: (214) 661-6859
                                             Email:  mheld@jw.com

                                             Brian A. Kilpatrick
                                             JACKSON WALKER LLP
                                             2323 Ross Ave., Suite 600
                                             Dallas, Texas 75201
                                             Telephone: (214) 953-5933
                                             Facsimile: (214) 661-6656
                                             Email: bkilpatrick@jw.com

                                             *Counsel for Petroleum Production Finance, Inc.,
                                             PPF 2 LLC and PPF 3 LLC*

DICONZA TRAURIG KADISH LLP
630 Third Avenue
New York, New York 10017
Allen G. Kadish
Harrison H.D. Breakstone
Telephone: (212) 682-4940
Facsimile: (212) 682-4942
Email: akadish@dtklawgroup.com
         hbreakstone@dtklawgroup.com

JACKSON WALKER LLP
2323 Ross Ave., Suite 600
Dallas, Texas 75201
Michael S. Held
Brian A. Kilpatrick
Telephone: (214) 953-6000
Facsimile: (214) 953-5822
Email: mheld@jw.com
         bkilpatrick@jw.com

*Counsel for Petroleum Production Finance, Inc.,
PPF 2 LLC and PPF 3 LLC*

Hearing Date: January 17, 2018
Hearing Time: 2:00 p.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

In re:                                                       Chapter 11

PONDEROSA ENERGY, LLC, and                     Case No. 17-13484-SHL
GS ENERGY, LLC,                                            (Jointly Administered)

                    Debtors.

-----------------------------------------------------------x

## MOTION TO TRANSFER VENUE OF THESE
## CASES TO THE NORTHERN DISTRICT OF TEXAS

PETROLEUM PRODUCTION FINANCE, INC., PPF 2 LLC and PPF 3 LLC (collectively, the "PPF Parties"), hereby respectfully submit, as and for its Motion (the "Motion"), pursuant to 28 U.S.C. § 1412 and Rule 1014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order transferring venue of these chapter 11 cases to

the United States Bankruptcy Court for the Northern District of Texas in the interests of justice and for the convenience of the parties, and in support hereof, respectfully state as follows:

### Preliminary Statement

1.      By this Motion, the PPF Parties seek to transfer venue of these chapter 11 cases to the United States Bankruptcy Court for the Northern District of Texas, the location of the Debtors' assets, facilities, contractors and creditors and the district in which the Debtors have often litigated, and are currently litigating, rather than the filing venue chosen by the Debtors, where the only nexus appears to be a shared office arrangement by the Debtors' managing member.

### Jurisdiction

2.      This Court has subject matter jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334.

3.      This Motion presents a core matter pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1408, subject to the request set forth in this Motion.

5.      The statutory predicates for the relief requested herein are 28 U.S.C. § 1412 and Bankruptcy Rule 1014.

## Background[1]

A.    <u>PPF Entities</u>

6.    Petroleum Production Finance, Inc. ("PPF"), a Delaware corporation with its principal office in Dallas, Texas, is financial services company that provides alternative sources of capital to independent oil and gas producers for whom traditional bank financing is either not available or not attractive. PPF owns PPF 2 LLC ("PPF2") and PPF 3 LLC ("PPF3"), which are Delaware limited liability companies.  The principal office and headquarters for PPF, PPF2 and PPF3 are located in Dallas, Texas.  Davis Martin ("Martin") is the President of the PPF Entities. He lives in Dallas, Texas.  The PPF Entities do not have any offices or employees in New York.

B.    <u>Sands/Ponderosa/GSE</u>

7.    In around August 2016, representatives of PPF were introduced to Richard F. Sands ("Sands"), President and Chief Executive Officer of Casimir Capital L.P. ("Casimir"), a brokerage firm in Greenwich, Connecticut registered with FINRA, SIPC, and the Texas State Securities Board.[2]  Sands was interested in seeking funding from PPF for one of his controlled companies, Debtor Ponderosa Energy, LLC ("Ponderosa"), which owned oil and gas leases/assignments in the Panhandle of Texas.

8.    Debtor GS Energy, LLC ("GSE") was formed later, for a second deal, as discussed below.  Ponderosa and GSE are Delaware limited liability companies and are under common control with Casimir, according to Casimir's FINRA filings.   According to its

---

[1]  Much of this background section tracks the factual statement set forth in First Amended Petition filed *in PPF 2 LLC, et al. v. GS Energy, LLC, et al.*, Cause No. DC-17-04608 in the 160th District Court of Dallas County, Texas (the "Dallas Case"), a case more fully described below.  Most of the documents referred to in this section are available as exhibits to such pleading, and that pleading will be separately submitted to the court for reference.

[2]  Casimir lists a Connecticut principal office address with FINRA (see BrokerCheck Report), with the Texas State Securities Board (see Certificate of Registration), and on its website(see https://www.energy.casimircapital.com/). Sands is Casimir's Designated Officer in Texas.

bankruptcy filings, Ponderosa and GSE have office addresses at 745 Fifth Avenue, Suite 537, New York, New York 10151, although this location appears to be part of Carr Workspaces.[3] Upon information and belief, all of Ponderosa and GSE's assets and operations are in Texas.

C.    VPP Transactions

9.    At issue here are two structured financing alternatives known as volumetric production payments ("VPP").[4]  The first VPP was between PPF2 and Ponderosa, and was closed on or about October 11, 2016.  The second VPP was between PPF3 and GSE and was closed on or about December 7, 2017.

D.    First VPP Between Ponderosa and PPF2

10.    In the summer of 2016, Sands, on behalf of Casimir and Ponderosa, began negotiations regarding a possible VPP transaction whereby PPF (later PPF2) would provide cash to Ponderosa in exchange for oil to be conveyed and delivered to PPF2.[5]  On or about August 16, 2016, PPF and Ponderosa signed an Indication of Interest Letter ("Ponderosa IOI Letter").  On September 8, 2016, they signed a Conditional Commitment for Financing Letter ("Ponderosa Commitment").  The Ponderosa Commitment provided that PPF2 would pay $2,100,000 (subject to upward or downward adjustment in correlation with the spot price of West Texas Intermediate Crude and the associated hedge as of the actual date of closing of the transaction) for 75,000 barrels of oil to be produced and delivered over a term of 42 months according to the delivery

---

[3]  Carr Workspaces is a company offering "rentable office space options" such as "move-in-ready office suites, fully furnished private offices, permanent or flexible desks, and virtual office solutions."  *See* https://carrworkplaces.com/locations/north-east/new-york/745-fifth-avenue/.

[4]  VPPs have been used for decades to monetize oil and gas reserves when traditional financing sources were unavailable or were less attractive. Large exploration and production companies have taken advantage of the VPP structure to monetize billions in assets without adding debt to their balance sheets under generally accepted accounting principles.

[5]  The original discussions and letter agreements were signed by Martin on behalf of PPF, but final agreements were ultimately consummated between Ponderosa and PPF2.

schedule attached to the Ponderosa Commitment as "Exhibit A." A list of proposed leases from which the oil would be produced was attached to the Ponderosa Commitment as "Exhibit B."

11.    This transaction was ultimately consummated on or about October 11, 2016, when PPF2 paid Ponderosa $2,510,000 for the purchase of 75,000 barrels of oil from Ponderosa's interests in mineral leases and wells in Hutchinson, Gray and Carson Counties, Texas. The transaction was structured as a non-operating, non-expense bearing limited term volumetric overriding royalty interest out of production which is memorialized by various agreements, including a Purchase and Sale Agreement ("Ponderosa PSA"), a Conveyance of Term Overriding Royalty Interest ("Ponderosa Conveyance"), a Production and Delivery Agreement ("Ponderosa PDA"), and a Deed of Trust, Mortgage, Assignment, Security Agreement and Financing Statement ("Ponderosa Deed of Trust").

12.    The agreements provided that Ponderosa would deliver 75,000 barrels of oil or pay volumetric production payments to PPF2 over the course of forty-two (42) months, beginning in October 2016 and ending in March 2020. The VPP scheduled barrels of oil to be delivered for October 2016 through June 2019 is 2,000 barrels. The VPP scheduled quantities of oil to be delivered for July 2019 through March 2020 is 1,000 barrels. This oil was coming from leases/wells operated by Ponderosa under leases/assignments from oil companies Shell and Valero, each of which paid royalties directly to Ponderosa (and, later, to PPF2).

E.    Second VPP Between GSE and PPF3

13.    At or around the same time the first VPP was closing, the parties began discussing a second VPP transaction whereby PPF (later PPF3) would provide additional cash to GSE in exchange for barrels of oil to be conveyed and delivered to PPF3 from other Ponderosa interests not included in the first VPP. On October 11, 2016, Sands expressly represented in writing to

PPF/PPF3 that this second VPP would be secured by mineral leases and wells from (1) GSE, (2) "25% non op wi ponderosa",[6] and (3) Newtex, that collectively produced "100 bbls of OIL per day net easily." The word "Newtex" referred to certain mineral leases and wells that Sands said Ponderosa/GSE had obtained from New-Tex Petroleum. These leases are known as the "State A" and "State B" leases (collectively referred to herein as the "State Leases") because they were originally granted by the State of Texas in 1927 to their original lessee, J. M. Huber corporation.[7]

14.    To further induce PPF/PPF3 to enter into this second VPP transaction, Adam Sands (nephew of Richard Sands) provided PPF/PPF3 copies of Payment Remittances from Valero Energy on October 20, 2016, showing that Ponderosa had received significant volumes of oil from "State B." On October 21, 2016, Sands reiterated to PPF/PPF3 in an email on October 21, 2016, his high expectations of production from the "State B" development, going so far as to say that it "alone will be more than enough to cover the VPP":

> Gents. **This is what we want to fund against**.
>
> These are actually daily numbers. A few days in oct.. when dcp was down, but again back up now.
>
> Our plan is to put 2mm directly into developing these leases further. For example **the state B has a rig going out Monday**. each additional well there will IP 30 BBLs OIL for a while and decline to 5 BBLs oil. That will be done for 150k!!!
>
> We will then do another 6 wells. **The state B development alone will be more than enough to cover the VPP.**

(Emphasis added). This email included a spreadsheet setting forth specific production figures from "State B."

---

[6]  The GSE Indication of Interest Letter referenced this component as a "non-operated 25% working interest in certain properties of Ponderosa (the "Ponderosa Non-Op Interest")."

[7]  These leases were located in and under the Canadian River, which, at the time they were first conveyed in 1927, was a navigable waterway that traversed through Hutchinson County, Texas, and several other counties in the Texas Panhandle.

15.     On October 24, 2016, Sands continued to offer production from the State Leases as an enticement to PPF/PPF3 to enter into this new transaction, breaking down the anticipated projection by barrels per day per source:  "State B: 40 bbls oil; GS Energy: 60 bbls oil; 25% non op wi: 20 bbls oil."  Sands expressly stated that these estimates were "very conservative."  *Id.* GSE also gave PPF/PPF3's representative a tour of these mineral leases and wells, which included the State Leases.  PPF/PPF3's representative was very encouraged by the activity on these leases in light of the representations of Sands.

16.     In reliance on Sand's representations, PPF/PPF3 agreed to go forward with this new VPP, and Martin and Sands signed a Preliminary Indication of Interest Letter on or about October 28, 2016 ("GSE IOI Letter").  By this GSE IOI Letter, PPF3 committed to provide a $2,235,000 advance payment to GSE in exchange for 75,000 barrels of oil to be paid out at the rate of 1,000 bbls/month for months 1-8; 2,000 bbls/month for months 9-41, and 1,000 bbls/month for month 42.  "Exhibit A" to the GSE IOI Letter set forth a list of leases/wells included in the VPP, and it included the State Leases (under the heading "New-Tex Petroleum Properties").

17.     On November 2, 2016, one of PPF/PPF3's representatives told Sands that the State Leases would be more than enough to satisfy PPF/PPF3's consultant's concerns about volume of production.  Sands responded that he "needed the money!" and asked PPF/PPF3's representative to "promise you will make it so."

18.     On November 8, 2016, GSE's attorney sent PPF3's attorney the "Exhibit A" to be used for the second VPP (list of leases).  This "Exhibit A" did not include the State Leases from New-Tex, and this mistake carried through to the final documents, as discussed further below. Despite the omission of State Leases from the document that would become the final exhibit to

the agreements, Sands continued to discuss production from those leases, though, leading PPF3 to continue to believe that they were included in the second VPP.  On November 9, 2016, after PPF/PPF's representative had visited the State Leases in person, Sands asked him whether he happened to see State B8, which had just "come on".

19.    This intention to include the State Leases was further evidenced in the written Conditional Commitment for Financing Letter dated November 18, 2016, executed by Sands and Martin, which included the State Leases in Hutchinson County under the heading "New-Tex Petroleum Properties" ("GSE Commitment").  Inclusion of the State Leases was critical to PPF/PPF3 because their own consultant had informed them that these leases were the primary source of production for the proposed VPP.  Sands executed the GSE Commitment Letter (which included the State Leases) and emailed it to Martin on Friday afternoon, November 18, 2016.  However, those same State Leases were not included on the "Exhibit A" circulated by GSE's counsel on Monday, November 21, 2016.

20.    Because of this oversight or conscious omission by GSE/Sands, which PPF/PPF3 believes was intended to mislead and deceive PPF/PPF3, the final agreements for this second VPP included the "Exhibit A" which omitted the State Leases' title and lease information.  At no time during the finalization of the agreements did GSE or its attorneys point out the omission of these leases to PPF/PPF3.  Instead, GSE and Sands and their attorneys pressured PPF/PPF3 and their attorneys to close the deal quickly.  PPF/PPF3 acquiesced to GSE/Sands' demands and closed the deal about 10 days later despite the errors, mistakes and/or omissions in the documents.  GSE/Sand knew, or should have known, that PPF/PPF3 relied on the representations that the State Leases were to be included in this second VPP, and GSE/Sands failed to point out the omission of these leases from the final documents.

21.    At closing on or about December 7, 2016, PPF3 provided GSE with an advance payment of $2,100,000 to purchase 75,000[8] barrels of oil from GSE's interests in mineral leases in Hutchinson, Moore and Carson Counties, Texas.  This transaction, like the first VPP, was memorialized by various agreements, all of which were dated December 1, 2016, including a Purchase and Sale Agreement ("GS PSA"),[9] a Conveyance of Term Overriding Royalty Interest, ("GS Conveyance"),[10] a Production and Delivery Agreement ("GS PDA"),[11] and a Deed of Trust, Mortgage, Assignment, Security Agreement and Financing Statement ("GS Deed of Trust").[12]

F.    The Rebate Letter Debate

22.    After closing the second deal, the parties had some discussions about a rebate letter.  Sands wanted a share in profits, if any, that the PPF Entities might get from certain hedging transactions.  Sands continued to discuss the State Leases and their production during this time, and as further enticement to try to convince the PPF Parties into providing some rebate on terms never agreed upon.

G.    Trouble Starts Quickly

23.    Shortly after the second deal was closed, it became apparent to the PPF Entities that Ponderosa and GSE were not producing enough oil to support the VPPs. This was not readily apparent to the PPF Entities early on, though, because Ponderosa and GSE paid PPF2 and

---

[8]  Based on documents and communications between the parties both before and after closing, it also appears that this second VPP was supposed to be for 80,000 barrels but the final documents incorrectly stated 75,000 barrels.

[9]  The Ponderosa PSA and the GS PSA shall be referred to collectively as the "PSAs."

[10]  The Ponderosa Conveyance and GS Conveyance shall be referred to collectively as the "Conveyances".

[11]  The Ponderosa PDA and the GS PDA shall be referred to collectively as the "PDAs."

[12]  The Ponderosa Deed of Trust and the GS Deed of Trust shall be referred to collectively as the "Deeds of Trust."

PPF3 on account, which Sands referred to as "good faith" payments, with no identification or allocation between the two deals and no reconciliation with actual sales from the third party purchasers of the hydrocarbons (Shell and Valero).  Upon information and belief, Ponderosa made the first good faith payment to PPF2 to induce PPF3 to enter into the second VPP before it knew that oil production was insufficient, and later to entice rebate terms never agreed upon. Even with the "good faith payments," though, PPF2 and PPF3 pointed out to the Debtors that as of February 23, 2017, a shortfall already existed of at least $244,490.00 in cash equivalents of oil.[13]

H.    Dallas County Litigation

24.    In early 2017, the PPF Entities tried repeatedly to get contractually mandated accountings and other reports from the Debtors, but the Debtors failed and refused to provide the requested documents and information.  Instead, the Debtors and their then counsel embarked on a campaign of delay and obfuscation.  On April 19, 2017, after it became apparent that the Debtors had no intent to comply with the VPP agreements by providing oil in the scheduled amounts or the contractually required reports and accountings, PPF2 and PPF3 filed suit against Ponderosa and GSE in state district court in Dallas County, Texas, initially asserting breach of contract.  *See PPF 2 LLC, et al. v. GS Energy, LLC, et al.*, Cause No. DC-17-04608 in the 160th District Court of Dallas County, Texas (the "Dallas Case").

25.    The PPF Entities added new claims and defendants [Sands and Casimir] on May 15, 2017, alleging that "Exhibit A" to the agreements (a list of leases from which oil was being conveyed to the PPF Parties) failed to include State Leases that the parties intended to include, that Sands had represented before and after closing were included, and without which the PPF

---

[13] In their adversary proceeding, the Debtors inappropriately refer to these good faith payments as payments made in good faith during settlement negotiations.

Parties would never have entered into the deal.[14]  The PPF Parties alleged that the omission of

the State Leases was the result of mutual mistake or fraud by the Debtors and Sands to

purposefully take advantage of the PPF Entities ' mistaken belief that the agreements included

such leases.  As outlined above, the PPF Entities included emails from Sands both before and

after this second VPP was closed in which he expressly represented that the State Leases were

included in the deal and that production from these leases were, by themselves, enough to

support the cash price for the VPP.  The PPF Entities alleged, upon information and belief, that

GSE failed to point out these mistakes in the agreements either because it also mistakenly

believed that the final agreements included the State Leases (mutual mistake), or to purposefully

take advantage of PPF/PPF3 knowing that they were operating under the mistaken belief that the

agreements included the State Leases.

I.    Hutchinson County Lawsuit

26.    Because the VPP agreements also allowed for foreclosure under the Deeds of

Trust, the PPF Entities started a simultaneous course of non-judicial foreclosure in Texas, and

noticed the properties for sale for June 2017. Shortly before the June sale was scheduled to

commence, though, the Debtors hired new counsel in Hutchinson County, Texas, and filed a

separate lawsuit against the PPF Entities seeking a temporary restraining order to enjoin the

foreclosure sale, *GS Energy, LLC, et al. v. Petroleum Production Finance, Inc., et al.*, Cause No.

42908 in the 84th Judicial District Court of Hutchinson County, Texas (the "Hutchinson Case").[15]

---

[14]   The PPF Parties added causes of action for conspiracy, fraud, and negligent misrepresentation, arising from misrepresentations, omissions and/or mistakes in the second VPP deal. The PPF Parties also alleged unjust enrichment and conversion, showing that the estimated shortfall from Ponderosa and GSE as of May 15, 2017 was a cash equivalent of $478,093.46. The PPF Parties also sought an accounting and an injunction.  An Agreed Temporary Injunction was entered by the court on December 4, 2017.

[15]   The Debtors retained Leon Mitchell in Borger, Texas, to represent them in the Dallas Case and the Hutchinson Case. Mr. Mitchell's firm is also listed as a creditor in the bankruptcy. *See* List of Unsecured Creditors [Ponderosa Docket No. 3].

In the Hutchinson Case, the Debtors alleged that the VPP Agreements were usurious loans instead of conveyances of mineral interests.

J.      The Hutchinson Court Transfers Venue to Dallas County

27.      The PPF Entities objected to venue in Hutchinson County and asked that court to abate the case in favor of the first filed forum in Dallas County, Texas. Debtors simultaneously sought a transfer of the Dallas Case to Hutchinson County.  On August 9, 2017, the Dallas Court denied the Debtors' motion to transfer, holding that Dallas County was the proper venue to adjudicate the parties' disputes.  On August 25, 2017, the Hutchinson Court notified the parties by letter that he was abating the case in favor of the Dallas Case, and he issued a formal order on August 28, 2017.

K.      Signal Oil Lawsuit

28.      Unbeknownst to PPF/PPF3 at the time it was negotiating the second VPP, GSE's title and ownership rights with respect to the State Leases was already subject to ongoing litigation (and an injunction) in another lawsuit pending in the 84th District Court of Hutchinson County, Texas, styled *Signal Drilling, LLC vs. New-Tex Operating, LLC, et al*, Cause No. 41971 ("Signal Lawsuit").  In that suit (now stayed presumably because of this bankruptcy), Signal Drilling, LLC ("Signal") alleged that it was the rightful fee simple owner of certain of the State Leases.  On December 8, 2016, Signal added Ponderosa as a party defendant in the Signal Lawsuit, alleging that New-Tex assigned the Riverbed Leases to Ponderosa by bill of sale dated August 8, 2016, and made effective May 1, 2016, in violation of a Temporary Injunction entered by the court on July 29, 2015.  On February 20, 2017, Signal filed an additional pleading, alleging that Ponderosa had also violated the injunction by trying to convey the State Leases to another entity controlled by Sands and Casimir.

29.    Upon information and belief, the Debtors knew about the Signal Lawsuit in October 2016 when the parties were negotiating the second VPP, yet consciously misled PPF/PPF3 into believing that these leases (with significant production) were part of the second VPP.   In fact, when the State Leases were later brought up (after the deal had closed), a representative of GSE cavalierly remarked that the deal could not have included the State Leases because such leases were tied up in other litigation.

L.    The Debtors Further Delay

30.    On August 28, 2017, the parties and their counsel had a settlement meeting in Dallas, Texas, in advance of a non-judicial foreclosure noticed for September 5, 2017.   Because the parties reached tentative agreement on a framework for settlement, the PPF Parties agreed to again postpone the September 5, 2017 non-judicial foreclosure.   From September 1, 2017 through December 1, 2017, the parties, through counsel, went through an inordinate amount of back-and-forth to finalize settlement documents and deeds in lieu of foreclosure.   On November 9, 2017, the parties filed a joint motion to continue a December 4, 2017 trial setting to allow them to finalize their settlement.   Foreclosure was noticed for December 5, 2017 to accommodate the negotiations.

31.    On November 30, 2017, the Debtors' counsel at Dykema advised the PPF Parties' counsel to make one final change on the Settlement Agreement requested by Mr. Sands, and on December 1, 2017, counsel for the Debtors (at Dykema) advised counsel for the PPF Parties that Mr. Sands had signed the settlement documents (but that she did not have authority to release the scans of same).   Counsel for the PPF Parties repeatedly tried to reach the Dykema lawyers on Monday, December 4, 2017, to advise them that the PPF Parties had signed the settlement documents, and requesting copies of the Debtors' signatures (so as to avoid the potentially

unnecessary time and expenses associated with another foreclosure which had been noticed for the following day). Dykema never returned those calls or emails.

M.     The Chapter 11 Filings in this Court

32.     The Debtors filed these Chapter 11 cases with yet new counsel in yet a new court on the morning of the latest scheduled foreclosure on December 5, 2017. Despite the pendency of the Dallas Case since April 2017, the Debtors are attempting to have the same issues -- already being litigated in the Dallas Case -- heard in yet a third forum through the filing of an adversary proceeding in these Chapter 11 cases, *Ponderosa Energy, LLC et al. v. PPF 2 LLC, et al.*, Adv. Pro. No. 17-01239-SHL. While the Debtors are attempting to use Chapter 11 to relocate, relitigate and recast the narrative of the Dallas Case, they have also chosen to disenfranchise by choice of venue 24 out of their total 26 creditors,[16] all of whom are located in Texas, where the PPF Parties are located, where the PPF Parties' assets (oil in the ground) and collateral relevant to the Debtors are located, and where Debtors' assets, field operations, lead bankruptcy counsel and the Dallas Case (wherein the issues are governed by Texas law) are all located.

**Relief Requested**

33.     By this Motion, the PPF Parties respectfully request entry of an order, substantially in the form of that attached as Exhibit A hereto, transferring venue of these chapter 11 cases, and all related adversary proceedings, to the United States District Court for the Northern District of Texas at Dallas, for referral to the United States Bankruptcy Court for the

---

[16]     See Ponderosa and GSE Lists of Unsecured Creditors [Ponderosa Docket Nos. 3]. Only two creditors are listed without Texas addresses -- Xcel Energy with a Minnesota address is listed as being owed a total of $25,013 (for utilities) and Lilling and Company is listed with a New York address and either a duplicative total of $10,000 or an aggregate of $20,000 (for accounting services).

Northern District of Texas at Dallas in the interests of justice and for the convenience of the parties, pursuant to 28 U.S.C. § 1412 and Bankruptcy Rule 1014.

## Legal Authority

A.    28 U.S.C. § 1412

34.    The PPF Parties' request is authorized by 28 U.S.C. § 1412.  This section permits transfer of venue of a case or proceeding under the Bankruptcy Code from one district to another "in the interest of justice or for the convenience of the parties."  28 U.S.C. § 1412.

B.    Bankruptcy Rule 1014

35.    The PPF Parties' request is similarly authorized by Bankruptcy Rule 1014, which provides that:

> If a petition is filed in the proper district, the court, on the timely motion of a party in interest or on its own motion, and after hearing on notice to the petitioners, the United States trustee, and other entities as directed by the court, may transfer the case to any other district if the court determines that the transfer is in the interest of justice or for the convenience of the parties.

C.    Court's Discretion

36.    The relief sought in this Motion rests within this Court's discretion.  Motions to transfer venue are evaluated on a case-by-case basis as the movant must show transfer is appropriate by a preponderance of the evidence.  *See In re Patriot Coal Corp.*, 428 B.R. 718, 739 (Bankr. S.D.N.Y. 2012) (Chapman, J.) (*citing Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1390-91 (2d Cir. 1990)).

D.    Two Tests

37.    The two tests, "interest of justice" and "convenience of the parties" are stated in the disjunctive, and therefore, "interest of justice" and "for the convenience of the parties" "each give authority independent of the other."  *Enron Corp. v. Arora (In re Enron Corp.)*, 317 B.R.

15

629, 637 (Bankr. S.D.N.Y. 2004) (Gonzalez, J.).    According to the Second Circuit Court of

Appeals:

> The "interest of justice" component of § 1412 is a broad and
> flexible standard which must be applied on a case-by-case basis.  It
> contemplates a consideration of whether transferring venue would
> promote the efficient administration of the bankruptcy estate,
> judicial economy, timeliness, and fairness ...

*Manville*, 896 F.2d at 1391.

     38.    Some courts have further described the "interest of justice" standard as follows:

> The court considers whether (i) transfer would promote the
> economic and efficient administration of the bankruptcy estate; (ii)
> the interests of judicial economy would be served by the transfer;
> (iii) the parties would be able to receive a fair trial in each of the
> possible venues; (iv) either forum has an interest in having the
> controversy decided within its borders; (v) the enforceability of
> any judgment would be affected by the transfer; and (vi) the
> plaintiffs original choice of forum should be disturbed.

*In re Dunmore Homes, Inc.*, 380 B.R. 663, 671-72 (Bankr. S.D.N.Y. 2008) (Glenn, J.).    The

factor to be given the most weight is typically the promotion of the economic and efficient

administration of the estate.    *See Patriot Coal*, 428 B.R. at 747.

     39.    The "convenience of parties" factors have also been described as follows:

> To assist in gauging 'convenience of witnesses' and 'interests of
> justice,' some relatively objective factors have been considered:
> (1) proximity of creditors; (2) proximity of the debtor; (3)
> proximity of witnesses necessary to the administration of the
> estate; (4) location of assets; (5) economic administration of the
> estate ...

*In re Eclair Bakery Ltd.*, 255 B.R. 121, 141 (Bankr. S.D.N.Y. 2000).    *See also In re Landmark*

*Capital Co.*, 19 B.R. 342, 347-48 (Bankr. S.D.N.Y. 1982).

     40.    Examination of these factors establishes that venue should be transferred to the

Northern District of Texas.

I.   Interests of Justice

41.    The PPF Parties examine the relevant factors below, as follows:

(i)     Whether transfer would promote the economic and efficient administration of the bankruptcy estate;

(ii)    Whether the interests of judicial economy would be served by the transfer;

(iii)   Whether the parties would be able to receive a fair trial in each of the possible venues;

(iv)    Whether either forum has an interest in having the controversy decided within its borders;

(v)     Whether the enforceability of any judgment would be affected by the transfer; and

(vi)    Whether the original choice of forum should be disturbed.

(i)   Whether transfer would promote the economic
      and efficient administration of the bankruptcy estate

42.    Transfer of venue would keep all the litigation among the key parties to this case in their home courts – the state and federal courts in the Dallas area, where the state court litigation pends that precipitated these chapter 11 filings.  The parties are located there and for that reason and the reasons set forth below, transfer to that court of these chapter 11 cases and any attendant adversary proceedings would promote the economic and efficient administration of the chapter 11 estates.

43.    The issues are already 8 months into the litigation process, and certain discovery has already been commenced.  Non-judicial foreclosure has been set, delayed and re-scheduled.

44.    The filing in this district has required the PPF Parties to double-up on their counsel.  Thus the filing caused inefficiency that could be eliminated with transfer to Texas.

    (ii)  Whether the interests of judicial
          economy would be served by the transfer

45.      An element of judicial economy is whether either court has an advantage on the "learning curve" of the matters relevant to the case. *Enron*, 317 B.R. at 638-39. This chapter 11 case is in its earliest stages, so this Court has not had to expend resources to become expert on the VPP transactions at the heart of the disputes presented here. While this Court has a deserved reputation for quickly becoming expert on many areas of business and commerce, and real and personal property transactions and interests, and is a premier, busy and efficient bankruptcy court, the United States Bankruptcy Court for the Northern District of Texas, located in an oil and gas producing region, is bound to have administered many more cases involving the oil and gas industry and mineral and real property rights therein.

46.      "It makes good sense 'to locate the bankruptcy in a venue where the judge presiding would more likely have active familiarity with the community and the milieu' in which the [debtors operate]. Such a judge 'would be in a much better position to gauge the likelihood of an effective reorganization.'" *In re B.L. of Miami, Inc.,* 294 B.R. 325, 332 (Bankr. D. Nev. 2003) (*quoting In re Abacus Broadcast. Corp.*, 154 B.R. 682, 683 (Bankr. W.D. Tex. 1993). Further, the existence of related litigation in another district supports the transfer of a case to that district. *In re Asset Resolution LLC*, No. 09-16142 (AJG), 2009 WL4505944, *3 (Bankr. S.D.N.Y. Nov. 24, 2009) (a loan servicer entangled in affiliate litigation in Nevada was transferred to that district); *Eclair Bakery*, 255 B.R. at 142. The adversary proceeding filed in this case would also hinge on local facts and law.

(iii)  Whether the parties would be able to
       receive a fair trial in each of the possible venues

47.    This factor does not appear to favor one forum over another in these cases.  There is no doubt the PPF Parties, and all parties, would receive fair process and hearings in either court.

(iv)  Whether either forum has an interest in
      having the controversy decided within its borders

48.    The Northern District of Texas has a deeper interest in deciding a local controversy.  To the best of the PPF Parties' knowledge, all of the Debtors' oil and gas assets, including the mineral assets and the wells that are the subject of the VPP transactions at issue here, are located in Texas.  The oil and gas industry is essential to the economy of Texas but has a much smaller impact on the economy of New York.  The people of Texas are familiar with and dependent on the oil and gas industry.  Significant issues in this case -- whether wells go bad from improper maintenance, whether hands-on service providers are compensated, whether outstanding contracts and agreements are properly honored -- will all surely affect the local parties in Texas, the local Texas economy and are grounded in local law, while none of these (save for an executive or two and professionals) would have such effect in New York.  *See Landmark Capital*, 19 B.R. at 348 ("there is a local interest in having localized controversies decided at home").

49.    The VPP contracts are governed by Texas law.  Rights under a VPP transaction are fee simple real property rights in Texas.  *See e.g. Terry Oilfield Supply Co. v. Am. Sec. Bank, N.A.,* 195 B.R. 66, 70 (S.D. Tex. 1996).  The local courts have a keen interest in enforcing rights to real estate.  Further, a key dispute is whether state-owned wells were intended to be included,

19

and were included, in the transactions.  Any witnesses on these points would likely be local in Texas.

50.    There is likely a strong interest in the local federal courts declining to "second-bite" a local state court litigation.  Texas surely has a stronger interest.

(v)  Whether the enforceability of any
     judgment would be affected by the transfer

51.    There is already matured litigation in Texas.  Since the Debtors' wells are located in Texas, any judgments that may arise in these cases are more likely to require enforcement in Texas than in New York.  It is not clear what assets of the Debtors, if any, are located in New York.  Clearly, the bulk of the Debtors' mineral interests and real property, and their value, as reflected in the Debtors' own filings, are located in Texas.

52.    The law governing the VPP agreements explicitly is Texas law.  Texas has the interest in interpreting and applying Texas law.

(vi) Whether the original choice of forum should be disturbed

53.    Upon information and belief, the Debtors established venue in New York by being located in a short-term shared office space in New York, for these and other commonly owned businesses.  Without seeing the Debtors' yet-to-be filed schedules and statements of affairs, and without a Rule 2004 examination, it is as yet unknown whether the premises identified at 745 Fifth Avenue, Suite 537, New York, New York, are a direct lease or a virtual office or short-term shared work-space arrangement, not really a headquarters at all.  The Debtors function through Texas resident Cory Meadows, from his home and operations center located in or around Hutchinson County, Texas, which is in the Northern District of Texas.  All of the Debtors' assets and operations are in Texas.

54.    The extensive contacts with Texas and the minimal contacts with New York justify disturbing the Debtors' choice of forum in favor of a forum with a deeper interest in the matters presented.  *See, e.g., Dunmore Homes*, 380 B.R. at 673 ("Dunmore lacks any ties to New York, other than its recent incorporation in the state and its efforts to secure financing here").

## II.  Convenience of the Parties

55.    The PPF Parties examine the relevant factors below, as follows:

        (i)      proximity of creditors;

        (ii)     proximity of the debtors;

        (iii)    proximity of witnesses necessary to the administration of the estate;

        (iv)     location of assets; and

        (v)     economic administration of the estate

### (i)   Proximity of Creditors

56.    The PPF Parties are based in Dallas.  The PPF Parties represent overwhelmingly the most significant parties in interest here, by far the largest creditors, the largest secured creditors and the parties with the ownership in oil in the ground subject to the VPP transactions.

57.    Of all other creditors, the Debtors disenfranchised by choice of venue 24 out of their total 26 creditors.[17]   Only two creditors are listed without Texas addresses. It should be noted that the each of the Debtors' largest creditors – BP Energy Company (listed as being owed $628,000 by Ponderosa Energy, LLC), and Philip Gunn (listed as being owed $473,787.48 by GS Energy, LLC) – are both located in Texas, and respectively dwarf all of the other debts listed

---

[17] See Ponderosa and GSE Lists of Unsecured Creditors [Ponderosa Docket Nos. 3]. Only two creditors are listed without Texas addresses -- Xcel Energy with a Minnesota address is listed as being owed a total of $25,013 (for utilities) and Lilling and Company is listed with a New York address and either a duplicative total of $10,000 or an aggregate of $20,000 (for accounting services).

as owed to other creditors in the cases.[18] Moreover, the 24 creditors located in Texas are largely small business vendor creditors providing goods and services to the Debtors.[19] These creditors are economically precluded, from a practical perspective, from participation in the Debtors' bankruptcy cases to the extent those cases proceed in this Court.

58.     Bankruptcy cases have been transferred to a district in which more of the creditors were located than the district in which the petition was filed.  *In re EB Capital Management LLC*, No. 11-12646 (MG), 2011 WL 2838115, at *4 (Bankr. S.D.N.Y. July 14, 2011) (a real estate investment case transferred from the Southern District of New York to South Dakota where four of the seven creditors were located); *Dunmore Homes,* 380 B.R. 663 (case of a homebuilder services firm, transferred from the Southern District of New York to the Eastern District of California where the real estate, activity and most creditors were located); *In re B.L. of Miami, Inc.*, 294 B.R. 325, 330-31 (Bankr. D. Nev. 2003) (a Miami nightclub case transferred from the District of Nevada to the Southern District of Florida where the vast majority of unsecured creditors were located); *Landmark Capital*, 19 B.R. at 348 (a real estate holdings case transferred from the Southern District of New York to the District of Arizona where three of four creditors were located).  "[C]ourts consider the ability of interested parties to participate in the proceedings and the additional costs that might be incurred to do so." *Dunmore*, 380 B.R. at 672 (citation omitted).

59.     The Northern District of Texas is thus a more convenient venue for the PPF Parties and for nearly all of the creditors than any other venue.

---

[18]    *See* Ponderosa and GSE Lists of Unsecured Creditors [Ponderosa Docket Nos. 3]. Ponderosa's other 17 unsecured creditors are alleged to be owed under $177,000, with individual unsecured creditors' debts ranging from $435.60 to $33,508.62. GSE's other 14 unsecured creditors are alleged to be owed under $159,000, with individual unsecured creditors' debts ranging from $588.29 to $73,153.70.

[19]    These creditors include various oil field services providers – i.e. pumpers, parts and service suppliers, machining services, roustabouts, etc., all located in the Northern District of Texas.

(ii)  Proximity of the Debtors

60.    The voluntary petitions in this case show that the principal assets of the Debtors are located in Texas.  Upon information and belief, all of the Debtors' assets and operations are in Texas.  The Debtors do not have any real assets or physical presence in New York, except some shared office arrangement, the details of which have not been made clear.

61.    In *B.L. of Miami*, 294 B.R. at 331, the court transferred the case of a Miami nightclub from Nevada to Florida, stating: "Although Debtor was incorporated in Nevada on September 3, 1997, and thus may technically 'reside' in Nevada, its primary place of business and its assets are in Florida."  The same is true here.

(iii)  Proximity of witnesses necessary to the administration of the estate

62.    All witnesses outside of the managing member are located in Texas, as are the PPF Parties and nearly all creditors.  The on-the-ground operators, contractors and other vendors, those who are least able to bear the expense and inconvenience of travel, and are essential to continuing operations, are located mainly in Texas.

63.    To the extent creditors are motivated to participate, or witnesses are needed to explain a VPP, or provide detail on oil and gas law, or on these transactions, these witnesses would likely be in Texas.

(iv)  Location of assets

64.    The Debtors hinge venue in New York on an office here.  However, the business of the Debtors is conducting oil and gas operations and it is the wells and income stream which are potentially the valuable assets of the Debtors.  The PPF Parties have Texas fee simple rights, and lien rights, at issue here.

65.     The location of a debtor's assets is most important where those assets constitute the value of the debtor's business. *Compare Dunmore Homes*, 380 B.R. at 677 (real estate assets were relevant in transferring case) with *Enron*, 274 B.R. at 347-48 (physical location of assets is not significant in a "financial" case where their location is less important); *B.L. of Miami*, 294 B.R. at 332 (Miami nightclub case transferred to district where debtor's principal asset was located); *Landmark Capital*, 19 B.R. at 345, 348 (a real estate holdings case including both Arizona and New York real estate and the Court transferred to the location of the most significant asset). *See also In re Pope Vineyards,* 90 B.R. 252 (Bankr. S.D. Tex. 1988) (a vineyard case transferred to California where the vineyard was located; location of assets is the key factor where the Debtor relies upon its realty) (*citing inter alia, In re Old Delmar Corp.,* 45 B.R. 883 (S.D.N.Y. 1985) (apartment complex case transferred to location of the real estate despite the location of the principals in New York)).

66.     Upon information and belief, all of the Debtors' assets and operations are in Texas and the Debtors occupy only a shared temporary office in New York. The principal assets of the Debtors are their operating wells, which are located in Texas and which are considered real property interests under Texas law.

67.     Again, the VPP transactions at issue here provide the PPF Parties not just with a security interest but with the ownership, the property right, in the oil located in Texas. Disputes at issue in the cases and the adversary proceeding involve fee simple and secured creditor rights and questions of what local and perhaps state-owned assets were supposed to be included in the VPP transactions.

(v)    Economic administration of the estate

68.    In effect, this factor combines all of the other factors regarding the convenience of the parties.  The location of the creditors, the debtors' assets, and the expected witnesses are all considered by the courts.  Here, nearly all of the creditors are located in Texas.  A majority of the Debtors' assets used in their businesses are located in Texas.  Independent contractors who run and maintain the wells are located in Texas and are not likely to utilize their limited resources to appear in the current New York venue.  On balance, it would be most economical for the case to be transferred to Texas.

## Conclusion

69.    The legal tests for "interests of justice" and "convenience of parties" have been conflated over the years.  Under any analysis, these cases and their attendant adversary proceedings belong before a local court.

**70.**    Under any test, these cases and their attendant proceedings should be transferred to the Northern District of Texas.  There is little connection to New York.  While New York is a hospitable and knowledgeable venue for any bankruptcy case, the tests focus on the best among choices, and the better venue among qualified venues is the Northern District of Texas.

71.    On venue cases we are instructed to defer to the wisdom of the parties with "money on the line." *Patriot Coal,* 482 B.R. at 748 (*citing In re Houghton Mifflin Harcourt Publishing Co.,* 474 B.R. 122, 124 (Bankr. S.D.N.Y. 2012) (Gerber, J.)).  The PPF Parties have the "money on the line" here by far, and venue should be transferred to the Northern District of Texas.

72.    No prior request for the relief requested in this Motion has been made to this Court or any other court.

25

WHEREFORE, the PPF Parties respectfully request (a) that given the foregoing factual and legal considerations, this Court exercise its discretion to transfer venue of the Debtors' cases (and all related proceedings) to the United States Bankruptcy Court for the Northern District of Texas, and (b) that this Court grant such other and further relief as this Court deems just and proper.

Dated: New York, New York
      December 22, 2017

DICONZA TRAURIG KADISH LLP

By:   s/ Allen G. Kadish               
    Allen G. Kadish
    Harrison H.D. Breakstone
630 Third Avenue
New York, New York 10017
Telephone: (212) 682-4940
Facsimile: (212) 682-4942
Email: akadish@dtklawgroup.com
        hbreakstone@dtklawgroup.com

and

Michael S. Held
JACKSON WALKER LLP
2323 Ross Ave., Suite 600
Dallas, Texas 75201
Telephone: (214) 953-5859
Facsimile: (214) 661-6859
Email: mheld@jw.com

Brian A. Kilpatrick
JACKSON WALKER LLP
2323 Ross Ave., Suite 600
Dallas, Texas 75201
Telephone: (214) 953-5933
Facsimile: (214) 661-6656
Email: bkilpatrick@jw.com

*Counsel for Petroleum Production Finance, Inc., PPF 2 LLC and PPF 3 LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

In re:                                              Chapter 11

PONDEROSA ENERGY, LLC, and                          Case No. 17-13484-SHL
GS ENERGY, LLC,                                     (Jointly Administered)

                        Debtors.

-----------------------------------------------------------x

### ORDER TRANSFERRING CASES OF
### PONDEROSA ENERGY, LLC, AND GS ENERGY, LLC,
### TO THE BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS

PETROLEUM PRODUCTION FINANCE, INC., PPF 2 LLC and PPF 3 LLC, having filed a motion (the "Motion") for an order pursuant to 28 U.S.C. § 1412 and Rule 1014 of the Federal Rules of Bankruptcy Procedure, to transfer the cases of Ponderosa Energy, LLC and GS Energy, LLC (collectively "the Debtors") to the United States District Court for the Northern District of Texas in the interests of justice and for the convenience of the parties ("the Motion"); and upon consideration of the papers filed in support of the Motion, as well as objections to the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that due and sufficient notice of the Motion having been given and no further notice be given; and upon the full record of the hearing to consider the Motion; after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.      The Motion be, and hereby is, granted to the extent set forth herein.

2.      Pursuant to 28 U.S.C. § 1412 and Rule 1014 of the Federal Rules of Bankruptcy Procedure, venue of the captioned cases, Case No. 17-13484-SHL (Jt. Admin.) and Adv. Pro. No.  17-01239-SHL, be and hereby are, transferred to the United States District Court for the Northern District of Texas.

3.      This Court shall retain jurisdiction to resolve any issues with respect to the relief

provided by this Order.

Dated: New York, New York
        _____ ___, 2018

                                        _____
                                        SEAN H. LANE
                                        UNITED STATES BANKRUPTCY JUDGE