Hearing Date: Wednesday, August 1, 2018 at 11:00 a.m.
Objection Deadline: Wednesday, July 25, 2018

DIAMOND McCARTHY LLP
Allan B. Diamond, Esq.
489 Fifth Avenue, 21st Floor
New York, NY 10017
Tel: (212) 430-5400
Fax: (212) 430-5499

Christopher R. Murray, Esq.
Charles M. Rubio, Esq.
909 Fannin Street, 37th Floor
Houston, Texas 77010
Tel: (713) 333-5100
Fax: (713) 333-5199

*Counsel for Ponderosa*
*Energy LLC and GS Energy LLC,*
*Debtors and Debtors-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

In re:

      PONDEROSA ENERGY, LLC and
      GS ENERGY, LLC

                    Debtors.

-------------------------------------------------------- x

Chapter 11
Case No. 17-13484-SHL
(Jointly Administered)

## DEBTOR PONDEROSA ENERGY LLC'S OBJECTION TO
## THE CITY OF NEW YORK DEPARTMENT OF FINANCE'S PROOF OF CLAIM

**THIS IS AN OBJECTION TO YOUR CLAIM. THE OBJECTING PARTY IS ASKING THE COURT TO DISALLOW THE CLAIM THAT YOU FILED IN THIS BANKRUPTCY CASE. YOU SHOULD IMMEDIATELY CONTACT THE OBJECTING PARTY TO RESOLVE THE DISPUTE. IF YOU DO NOT REACH AN AGREEMENT, YOU MUST FILE A RESPONSE TO THIS OBJECTION AND SEND A COPY OF YOUR RESPONSE TO THE OBJECTING PARTY WITHIN 30 DAYS AFTER THE OBJECTION WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE OBJECTION IS NOT VALID. IF YOU DO NOT FILE A RESPONSE WITHIN 30 DAYS AFTER THE OBJECTION WAS SERVED ON YOU, YOUR CLAIM MAY BE DISALLOWED WITHOUT A HEARING.**

**A HEARING HAS BEEN SET ON THIS MATTER ON AUGUST 1, 2018 AT 11:00 A.M. BEFORE THE HONORABLE SEAN H. LANE, UNITED STATES BANKRUPTCY COURT, SOUTHERN DISTRICT OF NEW YORK, ALEXANDER**

**HAMILTON U.S. CUSTOM HOUSE, COURTROOM 701, ONE BOWLING GREEN, NEW YORK, NEW YORK 10004.**

TO THE HONORABLE SEAN H. LANE, U.S. BANKRUPTCY JUDGE:

COMES NOW, Ponderosa Energy, LLC ("Ponderosa" or the "Debtor") and hereby files this *Debtor's Objection to The City of New York Department of Finance's Tax Claim* ("Objection") and states as follows:

## BACKGROUND

1.      On December 5, 2017 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code"), in this Court.

2.      Prior to the Petition Date, the Debtors' business was oil and gas exploration and production and the Debtors' held working interests in mineral leases in the Anadarko Basin in Northern Texas. These interests include hundreds of wells that produce substantial quantities of oil and gas.

3.      As of the Petition Date, the Debtors continue as debtors-in-possession to operate wells on the oil and gas leases they own in Northern Texas.

4.      On March 20, 2018, the Debtor (and debtor GS Energy LLC) filed a motion (the "Sale Motion"), requesting, *inter alia*, entry of an order (the "Sale Order") pursuant to 11 U.S.C. §§ 105 and 363, authorizing and approving (i) the sale of substantially all of the Debtor's assets pursuant to that certain Settlement and Sale Agreement and Release of Liability by and between the Debtor and GS Energy LLC, on the one hand, and Petroleum Production Finance, Inc.; PPF 2 LLC; and PPF 3 LLC (the "PPF Parties") free and clear of liens, claims, encumbrances, and other interests and (ii) the assumption and assignment of certain executory contracts and unexpired leases (the "Sale").

2

5.      On April 18, 2018, the Court approved the Sale and entered the Sale Order, and the Sale closed on May 2, 2018. Following the closing of the Sale, the Debtor no longer owns and operates its working interests in mineral leases in the Anadarko Basin, with the exception of a single lease and two wells known as the Chapman properties.

6.      On May 29, 2018, the City of New York Department of Finance ("NYCDF") filed its Proof of Claim (the "Proof of Claim" or "Claim").  NYCDF asserts that the Claim is entitled to priority pursuant.  NYCDF's Claim is for $351,238.89 (the "Claim Amount"), with NYCDF claiming that the entirety of the Claim Amount is entitled to priority treatment.

## JURISDICTION

7.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and the "Amended Standing Order of Reference" of the United States District Court for the Southern District of New York, dated December 5, 2012, effective as of February 1, 2012 (Preska, C.J.). Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

8.      Venue is properly before this Court pursuant to 28 U.S.C. § 1408.

## RELIEF REQUESTED

9.      The Debtor files this Objection pursuant to section 502(b) of title 11 of the Bankruptcy Code and Rule 3007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and seeks entry of an order denying the Claim.  A true and correct copy of the Claim is attached hereto as **Exhibit A**.  Ponderosa has examined the Claim and has determined that it is not a valid claim because the Debtor does not own any of the amounts sought in the Claim since the Debtor (A) was not in existence prior to April 2015; (B) is not a corporation; (C) never paid annualized rent of $250,000 or more for office space in Manhattan;

and (4) is not an unincorporated business, pursuant to New York City Admin. Code §11-502(c)(4).

## BASIS FOR RELIEF

10.    A filed proof of claim is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a).  If an objection refuting at least one of the claim's essential allegations is asserted, the claimant bears the burden of demonstrating the validity of the claim.  *See In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 Civ. 2229 (DC), 2010 WL 234827 (S.D.N.Y. Jan 22, 2010).  For the reasons discussed below, the Claim is not a valid priority claim, and thus the burden shifts to NYCDF to demonstrate otherwise.  *Id.*

11.    The relief requested is necessary and appropriate, is in the best interests of their estates and creditors, and should be granted in all respects.

### A.  NYCDF's Proof of Claim Should Be Reduced by at Least $139,858.12 Because the Debtor Was Not in Existence in the Calendar Years 2012 through 2014.

12.    NYCDF asserts it is entitled to a claim of $117,818.55 – plus $22,039.57 in interest and penalties associated with the general corporation tax – (collectively, the total of $139,858.12 shall be referred to as the "Previous Years Claim"), for the period of January 1, 2012 through December 31, 2014.  The Debtor objects to the allowance of the Previous Years Claim as the Debtor did not come into existence until April 2015.  In support of this Objection, attached as **Exhibit B** hereto is a true and correct copy of the Certificate of Formation of Ponderosa Energy, LLC, reflecting that the Debtor did not come into existence until April 2015.  Accordingly, the Debtor requests that NYCDF's Proof of Claim Amount be reduced by $139,858.12.

**B. NYCDF's Proof of Claim Should Be Reduced by $39,987.65 Because the Debtor Does Not Owe Any Corporation Tax.**

13.    NYCDF asserts it is entitled to a claim of $39,987.65 for a corporation tax (the "Corporation Tax Claim"), for the period of January 1, 2015 through December 5, 2017. The Debtor objects to the allowance of the Corporation Tax Claim as the Debtor is a limited liability company, not a corporation. In support of this Objection, attached as **Exhibit B** hereto is the Certificate of Formation of Ponderosa Energy, LLC, reflecting that the Debtor is a limited liability company. Accordingly, the Debtor requests that NYCDF's Proof of Claim Amount be reduced by $39,987.65.

**C. NYCDF's Proof of Claim Should Be Reduced by $167,443.43 Because the Debtor Does Not Owe Any Commercial Rent Tax.**

14.    NYCDF asserts it is entitled to a claim of $167,443.43 for commercial rent tax (the "Rent Tax Claim"), for the period of January 1, 2012 through December 5, 2017. As discussed *supra* at ¶ 12, the Debtor was not in existence prior to April 2015, and therefore does not owe taxes on the portion of the Rent Tax Claim attributable to the period from January 1, 2012 through December 31, 2014. Additionally, the Debtor objects to the allowance of the Rent Tax Claim because the tax applies only to tenants who rent space in certain areas of Manhattan who pay an annual or annualized gross rent of at least $250,000. In support of this Objection, attached as **Exhibit C** hereto are true and correct copies of the lease and lease renewals for the Manhattan office space rented by the Debtor, which show that the annualized gross rent paid by the Debtor did not exceed $73,200 (based on monthly payments of $6,100). Accordingly, the Debtor requests that NYCDF's Proof of Claim Amount be reduced by $167,443.43.

**D. NYCDF's Proof of Claim Should Be Reduced by $91,768.24 Because the Debtor Does Not Owe Any Unincorporated Business Tax.**

15.    NYCDF asserts it is entitled to a claim of $91,768.24 for unincorporated business tax (the "UBT Claim"), for the period of January 1, 2012 through December 5, 2017. As

discussed *supra* at ¶ 12, the Debtor was not in existence prior to April 2015, and therefore does not owe taxes on the portion of the UBT Claim attributable to the period from January 1, 2012 through December 31, 2014.   Additionally, the Debtor objects to the allowance of the UBT Claim because the Debtor is exempt from the tax pursuant to New York City Admin. Code §11-502(c)(4) – that is, the Debtor is not deemed an unincorporated business because the Debtor is primarily engaged in the purchase, holding and sale for its own account of real property. Accordingly, the Debtor requests that NYCDF's Proof of Claim Amount be reduced by $91,768.24.

## **CONCLUSION**

16.    NYCDF's Proof of Claim should be denied completely because it includes claims only for (A) amounts not owed by the Debtor since the Debtor was not in existence prior to April 2015; (B) amounts not owed by the Debtor since the Debtor is not a corporation; (C) amounts not owed by the Debtor since the Debtor never paid annualized rent of $250,000 or more for office space in Manhattan; and (4) amounts not owed by the Debtor since the Debtor is not an unincorporated business pursuant to New York City Admin. Code §11-502(c)(4). The Debtor therefore requests that the Proof of Claim amount be reduced in full and denied in its entirety.

## **NO PRIOR REQUEST**

17.    No prior motion for the relief sought has been made in this or any other Court.

## **NOTICE**

18.    Notice of this Motion has been provided to (i) the Office of the United States Trustee for the Southern District of New York; (ii) counsel for claimant, the City of New York Department of Finance; and (iii) all other parties required to receive notice of this Motion

6

pursuant to Bankruptcy Rule 2002.  The Debtors submit that no other or further notice need be

provided.

WHEREFORE, Debtor respectfully requests that this Court deny in its entirety the City of

New York Department of Finance's Proof of Claim and provide further relief, at law or in equity,

as this Court deems just.

Dated:  New York, New York
        June 25, 2018                              Respectfully submitted,


                                                   DIAMOND McCARTHY LLP

                                                   /s/ Charles M. Rubio
                                                   Charles M. Rubio
                                                   Christopher R. Murray
                                                   909 Fannin, Suite 3700
                                                   Houston, TX 77010
                                                   (713) 333-5100
                                                   crubio@diamondmccarthy.com
                                                   cmurray@diamondmccarthy.com

                                                   Allan B. Diamond
                                                   489 Fifth Avenue, 21st Floor
                                                   New York, NY 10017
                                                   (212) 430-5400
                                                   adiamond@diamondmccarthy.com
                                                   arosen@diamondmccarthy.com

                                                   *Counsel to Debtors and
                                                   Debtors-In-Possession*

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
**Southern District of New York**

------------------------------------------------------X

In Re: PONDEROSA ENERGY LLC

              Debtor(s).

------------------------------------------------------X

| | |
|---|---|
| **Bankruptcy Type** | Chapter 11 |
| **Case No.** | 17-13484 |
| **Claim No.** | 17-S-0134-MF |



## <u>Proof of Claim</u>

1. Debtor, PONDEROSA ENERGY LLC was at and before the filing by or against this debtor of the original petition in bankruptcy, and still is, justly and truly indebted or liable to the City of New York Department of Finance in the sum of **$351,238.89** dollars plus interest and penalties through the filing of the petition herein (at the rate set forth in the Administrative Code of the City of New York for such taxes) for the taxes on the schedule attached hereto and made a part hereof.

2. That the consideration of this debt or liability is the NYC Administrative Code statutory tax liability set forth in the schedule attached hereto and made a part hereof.

3. That no part of the debt or liability has been paid,

4. That there are no set-offs or counterclaims to the debt or liability,

5. That the City of New York does not hold, and has not, nor has any person by its order, or to the knowledge or belief of the undersigned, for its use, had or received, any security or securities for the debt or liability,

6. That no note or other negotiable instrument has been received for such account or liability or any part hereof; and that no judgment has been rendered thereon, except that a warrant or warrants for taxes were filed against the debtor as indicated on the attached schedule.

7. That demand is hereby made that the aforesaid claim be allowed and paid in full as a priority claim in advance of any distribution to creditors; and furthermore, that the said claim be entitled to the rights of a lien claimant, if applicable, pursuant to the provisions of the Administrative Code of the City of New York and the Bankruptcy Code.

8. That the said City of New York, by its duly constituted authorities has by this claim, to the extent not previously made by any assessment or notice of deficiency, duly made the assessment and to the extent not previously issued this claim shall constitute any required notice of deficiency, pursuant to the provisions of the Administrative Code of the City of NY enacted for the collection of taxes set forth herein.

9. That in accordance with subdivision b of section 546 of the Bankruptcy Code, the City of New York Department of Finance hereby perfects the lien of the taxes set forth on the attached schedule.

The undersigned, Catherine Leung, Supervisor of the Bankruptcy & Assignment Unit of the NYC Department of Finance, files this Proof of Claim for the unpaid taxes set forth on the schedule attached on behalf of the City of New York Department of Finance ("DOF").

Please make checks **payable** to the NYC Department of Finance and **mail** to:

NYC Department of Finance
Tax, Audit and Enforcement Division
345 Adams Street, 10th Floor
Brooklyn, New York 11201
Attn: Bankruptcy Unit

Penalty for Presenting Fraudulent Claims -- Fine of not more than $5,000 or imprisonment or no more than five years, or both - Title 18, U.S.C, § 152.

Dated: 23-May-2018
Brooklyn, New York

United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004-1408

By:_____

Audit Division
Bankruptcy & Assignment Unit
345 Adams Street -- 10th Floor
Brooklyn, New York 11201

**Schedule of Taxes Due** by debtor in possession based on. The City of New York, by its duly constituted authorities has by this claim, to the extent not previously made by any assessment or notice of deficiency, duly made the assessment and to the extent not previously issued this claim shall constitute any required notice of deficiency, pursuant to the provisions of the Administrative Code of the City of NY enacted for the collection of taxes set forth herein.

| Tax Deficiency - Pursuant to the Title 11 of the Administrative Code of the City of New York | | | | |
|---|---|---|---|---|
| **Type of Tax** | **Filing Period** | **Principal** | **Interest** | **Penalty** | **Total** |
| Corporation Tax | 1/1/2015 - 12/5/2017 | $30,000.00 | $1,987.65 | $8,000.00 | $39,987.65 |
| CRT | 1/1/2012 - 12/5/2017 | $115,637.10 | $25,400.08 | $26,406.25 | $167,443.43 |
| General Corp | 1/1/2012 - 12/31/2014 | $30,000.00 | $10,039.57 | $12,000.00 | $52,039.57 |
| UBT-Partner | 1/1/2012 - 12/5/2017 | $60,000.00 | $11,768.24 | $20,000.00 | $91,768.24 |
| | | $235,637.10 | $49,195.54 | $66,406.25 | $351,238.89 |

# EXHIBIT B

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 09:34 AM 04/16/2015*
*FILED 09:33 AM 04/16/2015*
*SRV 150517762 - 5729915 FILE*

Certificate of Formation
of

Ponderosa Energy, LLC

1. The name of this Delaware limited liability company is:
   Ponderosa Energy, LLC

2. The name and address of the registered agent of the Company is:
   Corporate Creations Network Inc.
   3411 Silverside Road Rodney Building #104
   Wilmington DE 19810

3. The Company will be a manager-managed company.

4. The profits and losses of the Company shall be allocated to the members in proportion to their percentage interest in the Company, unless otherwise provided in the Company's limited liability company agreement.

5. No member shall have the right to assign or transfer the member's interest in the Company or any interest in such member's interest without the approval of the Manager, which may be granted or withheld in its sole discretion, unless otherwise provided in the Company's limited liability company agreement.

The undersigned authorized person has executed this Certificate of Formation on April 16, 2015.

*Gina Mulligan*

AUTHORIZED PERSON:
Gina Mulligan

# EXHIBIT C



# OFFICE SERVICE AGREEMENT

This Office Service Agreement ("Agreement"), dated June 23 2016, is between **PBC 745 Fifth Avenue, LLC (dba Carr Workplaces)** ("CW") having an address at 745 Fifth Avenue, Suite 500 New York, NY 10151 (the "Center") and **Ponderosa Energy LLC**, a Delaware Limited Liability Company, ("Client") having an address at 15 Valley Drive Greenwich, CT 08631.

In consideration of the covenants and fees set forth herein and subject to the Terms & Conditions attached hereto, CW shall grant Client a license to use one or more offices in the Center (referred to herein as the "Office"), and the facilities and services of the Center (together with the Office, sometimes collectively referred to herein as the "accommodation"), upon and subject to the terms set forth below.

The basic terms of this Agreement are as follows:

**INITIAL TERM, OFFICE & MONTHLY CHARGES:**

| Agreement Term (months): | Office Numbers: | Start & End Dates: | # of Occupants | |
|---|---|---|---|---|
| 3 | Exterior 537 | 7/1/2016-9/30/2016 | 5 | |
| | | | Monthly Office Charges: | $5,800.00 |
| # Ala carte service (please specify): | Quantity | Unit Rate (mo): | | Monthly Service Charge: |
| | | | Total Monthly Fixed Fees:[1] | $5,800.00 |
| Monthly Office Charge includes: | 5 x multi-line handset with unlimited local and domestic LD usage, 5 x high speed internet connection, unlimited faxing, B&W copies , B&W prints and scans, lobby listing, access to Community Café with free gourmet coffee for office occupants and guests PLUS any additional a'la carte services listed above. | | | |

| SUMMARY OF FEES | |
|---|---|
| Setup Fees @ $250 per/occupant: | $1,250.00 |
| Retainer @ 1 x Monthly Office Charge: | $5,800.00 |
| **TOTAL DUE  AT SIGNING:** | **$12,850.00** |

[1] Any applicable state or local sales taxes will be reflected on each monthly invoice

| Description of any included furnishings: | 5 x workstations, 5 x two-drawer pedestals and 5 x desk chairs |
|---|---|

| Nature of Client's business: | Finance |
|---|---|

**Term and Commencement of Services:** This Agreement commences and expires on the dates specified above.  This Agreement will be automatically extended for consecutive periods of the same duration as the initial term, at an adjustment of 0% of the Monthly Office Charge, unless and until terminated by either party by delivery of written notice of expiration at least 1 calendar months prior to the date scheduled for expiration of the Agreement, so that the Agreement will end upon the last day of a calendar month.  This Agreement will terminate December 31, 2016.

The following Terms & Conditions, the Center Rules and Regulations attached hereto, and any attached Addenda are incorporated into and made a part of this Agreement and the parties hereto agree to be legally bound thereby.

**IN WITNESS WHEREOF**, both parties have duly executed this Service / License Agreement as of the day and year indicated below.

PBC 745 Fifth Avenue, LLC, dba Carr Workplaces
By:  Preferred Group, LLC, its authorized agent

*Gregg de los Reyes*

By: _Gregg de los Reyes (Jun 26, 2016)_

Name:  Gregg de los Reyes

Title:   General Manager

Ponderosa Energy LLC

By: _Richard sands (Jun 26, 2016)_

Name:   Richard Sands

Title:   Member manager

*Rev 7.15.13 SF*

Date: Jun 26, 2016                                        Date: Jun 26, 2016

# TERMS & CONDITIONS

1. **NATURE OF THE AGREEMENT:**

   1.1. This Agreement is the commercial equivalent of an Agreement for an accommodation in a hotel. The Center remains CW's property and in CW's possession and control. Client acknowledges that this Agreement is a license agreement and creates no tenancy interest, leasehold estate or other real property interest with respect to the accommodation and shall not be deemed or construed in any way to create a partnership or relationship of landlord and tenant between the parties hereto. CLIENT HEREBY WAIVES ANY AND ALL NOTICES TO CURE (EXCEPT AS EXPRESSLY SET FORTH IN SECTION 5.1 HEREOF), VACATE OR QUIT THE OFFICE.

   1.2. The Agreement is personal to Client and cannot be transferred or assigned to any other party, unless written request of such assignment is submitted to CW and CW agrees to such assignment, which will be at our sole discretion, and Client will not permit occupancy or use of any part of the Office or the Center by any persons other than Client, its agents and employees.

   1.3. Subject to all Terms & Conditions, Center Rules and Regulations, Exhibits and any Addenda, CW is granting Client a license for the use of the accommodations specified on the first page of this Agreement. All utilities, including any telephones and IT/data connection(s) as outlined on the first page of this Agreement, shall be provided to the accommodation without additional expense to Client. It is agreed that the Office is intended for the use of the total number of occupants listed on the first page of this Agreement. Should Client increase the number of occupants without CW's written approval, Client shall be charged additional fees as set forth on the Services Price List (as amended from time to time).

   1.4. This Agreement provides for Client's exclusive use of the Office as outlined on the first page of this Agreement, and for the shared, non-exclusive use of the common areas of the Center. When Client takes occupancy of the Office, CW will prepare an Inventory List for Client to confirm receipt of keys and/or entry cards and the condition of the Office and furniture. CW will deliver the Office and furniture in its "as is" condition at the commencement of the Agreement. CW makes no representations or warranties with respect to the Office, the furniture or the Center. By taking possession of the Office, Client acknowledges that the Office and the furniture are in good and satisfactory condition at the time of possession. If CW is unable to deliver possession of the Office at the commencement of the Agreement for any reason, this Agreement and Client's obligations hereunder will not be affected, except that Client shall not be required to pay any sums until CW delivers possession of the Office to Client.

   1.5. In the event the Center is no longer available and CW is permanently unable to provide the accommodations at the Center as stated in this Agreement, this Agreement will end and Client will only be obligated to pay monthly fees up to the date this Agreement ends and for the additional services Client has used. In such event, CW will try to find suitable alternative accommodations for Client at another center.

   1.6. CW will provide the number of serviced Office(s) in the Center for which Client has agreed to pay as stated in this Agreement. This Agreement lists the specific Office(s) CW has initially allocated for Client's use. CW may need to allocate different Office(s) of equal size from time to time upon not less than 30 days prior notice to Client. CW will pay any reasonable expenses incurred in connection with such relocation of Client's property.

   1.7. CW can enter Client's Office at any time. However, unless there is an emergency CW will, as a matter of courtesy, inform Client no less than 24 hours in advance either verbally or electronically when access is needed to the Office to carry out testing, repairing or work other than routine inspection, cleaning and maintenance. CW will endeavor to respect reasonable security procedures to protect the confidentiality of Client's business.

   1.8. Client, its agents, employees and invitees, agree to abide by and observe the rules and regulations of CW's lease (the "Lease") with the owner of the building ("Landlord") in which the Center is located. Client's Agreement is subordinate to the Lease and to any other agreements to which the Lease is subordinate. This Agreement terminates, if not earlier, simultaneously with the expiration or sooner termination of the Lease for any reason. Client does not have any rights under the Lease (and all requests for building services shall be directed solely to CW), although Client will attorn to Landlord in such cases as may be required by the terms of the Lease or requested by CW or Landlord.

   1.9. CW may assign this Agreement and Client agrees to accept any such assignee. Upon any such assignment, CW will be discharged from all liability hereunder.

   1.10. While this Agreement is in effect and for a period of six months after this Agreement ends, both parties agree not to solicit or offer employment to any of the other's current employees or anyone who has left either party's employment in the last 90 days. In the event that a breach of this covenant occurs, the breaching party agrees to pay, as liquidated damages, a sum of money equal to 100% of the employee's annual wages for each such breach.

   1.11. Client acknowledges and agrees that the terms of this Agreement and the relationship of the parties under this Agreement are confidential. Neither party may disclose them without the other's consent unless required to do so by law or an official authority. This obligation continues after this Agreement ends.

   1.12. All notices or other communications, except for service of process, must be in writing and shall be deemed duly given if delivered in person, or by a nationally-recognized commercial delivery service.

Client's Initials                          *Page 2*                          *Rev 11.13.14 SF*



1.13. This Agreement shall be interpreted under the laws of the jurisdiction in which the Center is located.  CLIENT HEREBY EXPRESSLY AND KNOWINGLY WAIVES ANY AND ALL RIGHT TO A JURY TRIAL IN ANY ACTION OR SUIT ARISING OUT OF THIS AGREEMENT OR THE PERFORMANCE OR NON-PERFORMANCE HEREOF.

1.14. Client must pay any reasonable and proper costs including legal fees that CW incurs in enforcing this Agreement.

1.15. This Agreement supersedes any prior agreement and embodies the entire agreement between Client and CW.  This Agreement is an arm's length transaction between disinterested parties.  There shall be no presumption of construction against the drafter of this Agreement.

1.16. Client and CW acknowledge and agree that neither Landlord, nor Landlord's agent, are parties to this Agreement and neither of them shall have any contractual liability or duty to Client by virtue of this Agreement, and that this Agreement shall not affect the rights and obligations between CW and Landlord.

2.  **USE AND OCCUPANCY:**

2.1. Client agrees to use and occupy the Office solely for general office purposes. Client will only conduct business in the name as stated on the first page of this Agreement or some other name that CW has previously approved in writing.

2.2. Client agrees to comply, at its expense, with all applicable laws, orders, regulations and rules, pertaining to the use and occupancy of the Office, and the conduct of Client's business.  Client must conduct its business so as not to interfere with the use of the Center by CW, its employees, the other clients of the Center, and the tenants of the Building and so as not to detract from the appearance of the Center.  Client must comply with CW's safety standards, with the Center Rules and Regulations attached hereto and the building's rules and regulations (copies of which are on file in the Manager's office).  Client may not cause any nuisance or annoyance, cause the increase of insurance premiums CW has to pay, or cause loss or damage to CW (including damage to CW's reputation) or to CW's Landlord.  Client acknowledges that (a) the terms of the this Section 2.2 are a material inducement in CW's execution of the Agreement and (b) any violation by Client of this Section 2.2 shall constitute a material default by Client hereunder, entitling CW to terminate this Agreement without further notice or procedure.

2.3. Client agrees to pay promptly (i) all sales, use, excise, consumption and any other taxes and license fees which Client is required to pay to any governmental authority (and, at CW's request, will provide evidence of such payment) and (ii) any taxes paid by CW to any governmental authority that are attributable to this Agreement, or the accommodations provided hereunder, including, without limitation, any gross receipts, rent and occupancy taxes, or tangible personal property taxes.

2.4. Client shall make no alterations or modifications in or to the Office, including, without limitation, affixing any signs or postings, and any door locks, without CW's prior written consent (which CW may grant or withhold in its sole discretion).  In the event that alterations or modifications are made without CW's prior written consent, CW may, at CW's option, correct or remove the same at Client's sole cost and expense.

2.5. All keys and entry cards remain CW's property and shall not be duplicated or transferred to third parties. The loss of keys or cards must immediately be reported to CW. Client will be responsible for the cost of lost keys or cards as well as the cost of changing locks.

2.6. Client may not have any advertising of any type using the address of the Center without CW's prior written consent (which CW may grant or withhold in its sole discretion). Use of the address on business cards, websites, and other standard business practices are acceptable without written consent.

2.7. Client acknowledges that CW will comply with the USPS regulations regarding Client's mail.  Client must also comply with all USPS regulations.  Failure to comply will result in immediate termination of this Agreement.

2.8. Client shall not, without CW's prior written consent (which CW may grant or withhold in its sole discretion), store or operate any computer equipment (except personal computer equipment) or any other large business machines, reproduction equipment, heating equipment, stove, mechanical amplification equipment, vending or coin-operated machines, refrigerator or coffee equipment.

2.9. Client may not install any cabling, IT or telecom connections without CW's prior written consent (which CW may grant or withhold in its sole discretion).  As a condition of CW consent, Client will permit CW to oversee any installations (for example, IT or electrical systems) to verify that such installations do not interfere with the use of the Center by CW, other clients or Landlord.  CW's consent may also be conditioned upon the payment of additional fees for installation and/or usage of such cabling, and/or the requirement that the Client remove the cabling, etc.  All cables in the ceiling or walls of the Center shall become CW's property.

2.10. The electrical current shall be used for ordinary lighting, powering personal computer equipment and small appliances only.  If Client requires any special installation or wiring for electrical use, telephone equipment or otherwise, such wiring shall be done with CW's prior written approval, at Client's sole expense by a company approved by CW.  Client shall not install or operate any equipment or machinery that requires a separate electrical circuit or consumes higher than normal and reasonable quantities of electricity.

3.  **FEES & SERVICES**

3.1. All Total Monthly Fixed Fees stated on the first page of this Agreement shall remain in effect throughout the initial term, or one year from the date of this Agreement, whichever period is shorter. Thereafter, the Monthly Office Charge will be adjusted by the percentage outlined in the section entitled "Term and Commencement of Services" on the first page of this Agreement.

3.2. All Total Monthly Fixed Fees are due in advance on the first calendar day of each month for the duration of this Agreement. All payments shall be made without deduction, offset or counterclaim. Fees for additional services are due on the first calendar day of the month after submission of the invoice to Client for additional services rendered through the 15th day (or such other period) of the previous month.

3.3. Upon Client's request to CW, during normal business hours, CW may provide additional services that are not included within the Monthly Office Charge or the Monthly Service Charge. The fee schedule for additional services is available upon request and may be updated at any time without notice. Client agrees to pay all charges listed on the first page of this Agreement as well as any additional services rendered. CW (and CW's designated vendors) is the only authorized service providers in the Center. If Client defaults under this Agreement, CW may cease providing any services to Client without resorting to legal process.

3.4. A late payment charge equal to 10% of the arrearage shall be due and payable if payment is not received by CW by the 5th day of the month. The amount of the late payment charge shall be the lesser of the amount stated or the highest amount permitted by law. In the event that Client's check is not honored because of insufficient funds, Client will pay CW a $100 fee in addition to all other remedies. In the event that Client's credit card is not honored, Client will pay a $50 fee in addition to all other remedies. A dishonor of Client's check or credit card more than two (2) times during the term of this Agreement shall be an immediate event of default for which no additional notice or cure period shall be required.

3.5. If Client benefited from a special discount, promotion or offer, it was for the initial term only, and CW may discontinue that discount, promotion or offer without notice if Client defaults under this Agreement.

3.6. Client is required to pay a service retainer equivalent to the amount stated on the first page of this Agreement. No interest will be paid on the retainer. This retainer will be held by CW as security for performance of all Client's obligations under this Agreement. If Client fails to perform any of its obligations under this Agreement, CW may apply Client's retainer to the balance due CW and any expenses or liabilities incurred by CW and Client agrees to replenish any portion CW applies. CW may increase the amount of Client's retainer if Client is in arrears in the payment of invoices. The retainer or any balance, after deducting outstanding fees, restoration fees and other costs due to CW, will be returned to Client after Client have settled its account to the address Client has provided to CW. In the event no address has been provided and any portion of Client's retainer is not claimed after 120 days, it will be automatically forfeited to CW.

4. **IT SERVICES AND SUPPORT:**

4.1. Client is responsible for ensuring that Client has adequate protection against viruses through the use of its own virus protection on its systems and hardware, and Client is expected to keep the software current with the latest virus definition files.

4.2. Client is prohibited from engaging in any violations of system or network security. Internet access may not be used in connection with attempts – whether or not successful – to violate the security of a network, service or other system. Examples of prohibited activities include, without limitation: hacking, cracking into, monitoring or using systems without authorization, scanning ports, conducting denial of service attacks, and distributing viruses or other harmful software. CW may disconnect Client's equipment and withhold services if CW determines that Client's hardware or software is, or has become, inappropriate for connection to CW's network or otherwise violates this provision.

4.3. Staff time spent on prohibited activities or policy violations can be initiated at Client's expense on an emergency basis without Client's permission and without an estimate or limit. CW will make a good faith effort to minimize the amount of billable time CW spends on an emergency basis. If CW is diagnosing a problem reported by another customer and find that the problem is caused by Client, Client will be billed for the time spent diagnosing that problem.

4.4. Client agrees not to perform any illegal or inappropriate uses identified by CW's network administrator.

4.5. Client's IT equipment or host servers can be co-located within CW's data room (as space permits) at a monthly fee per device. Client agrees to coordinate the removal of its IT equipment from the data room upon termination or expiration of this Agreement. Access to equipment that is co-located in CW's IT room is available during normal business hours. For security reasons, an employee or IT staff person of CW must supervise Client while Client is in CW's IT room and applicable charges will apply.

4.6. If Client uses excessive amounts of bandwidth or abuses the use of the shared network, Client will be notified and additional charges for high bandwidth usage will apply.

4.7. Client may connect Wireless Access Points to the network jacks in Client's Office upon CW's prior approval but such Wireless Access Points may not be used primarily as a means to circumvent network jack charges. Additional fees may apply.

4.8. Internet connectivity provided cannot be used for VoIP service without CW's prior written approval.

5. **DEFAULT AND TERMINATION:**

**CARR**
WORKPLACES

5.1. CW may terminate this Agreement immediately by giving Client notice and without need to follow any additional procedures if: (a) Client becomes insolvent, bankrupt, goes into liquidation or becomes unable to pay its debts as they become due, or (b) Client is in breach of one of Client's obligations under this Agreement which cannot be cured or which CW has given Client notice to cure and which Client has failed to cure within five (5) days of such notice, or (c) Client's conduct or that of someone at the Center, with Client's permission or invitation, is incompatible with ordinary office use.

5.2. CW shall have the right to terminate the Agreement immediately if Client is or becomes (i) identified on the Specially Designated Nationals and Blocked Person List maintained by the U.S. Department of the Treasury Office of Foreign Assets Control or any similar list or (ii) a person, entity, or government with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation or Executive order of the President of the United States.

5.3. If CW terminates the Agreement for any of the reasons described in the immediately preceding paragraphs, Client shall remain responsible for its outstanding obligations under this Agreement.  Client may, in addition to any other obligations contained herein, be required to:

- Pay for additional services Client has used;
- Pay the Monthly Office Charge for the remainder of the period for which Client's agreement would have lasted had CW not ended it, or for a further period of three months, whichever is longer; and,
- Forfeit Client's Retainer.

In such event, CW may also take possession of the Office.

5.4. A waiver by either CW or Client of a breach (or series of breaches) of any covenant or obligation under this Agreement of the other party shall not be construed to be a waiver of any other covenant or obligation or of any subsequent breach of the same covenant or obligation.  Notwithstanding the CW's reservation of any particular remedy hereunder, CW hereby reserves each and every remedy available at law or in equity in the event of a breach by Client hereunder.

5.5. Client agrees that if Client is in default under any agreement with CW or any of its affiliates at any center other than the one specified on the front page of this Agreement, CW may recover any unpaid sums due under such other agreement from Client under this Agreement, and that CW may, in particular (but is not limited to), withhold services under this Agreement or deduct sums from the service retainer held under this Agreement in respect of such unpaid sums.

5.6. Upon the expiration or termination of the Agreement, Client's right to occupy the Office and use the Center is revoked and Client will remove all of its property and return the Office and furniture in the same condition in which it was delivered to Client, subject to reasonable wear and tear.  Any personal property left in the Office will be considered abandoned and CW may dispose of it without any liability to Client.  All telephone and facsimile numbers are CW's property and cannot be transferred to Client at the expiration or termination of the Agreement.

5.7. Upon Client's departure or if Client, at Client's option (with CW's prior approval), desires to relocate to a different Office within the Center, in addition to any amounts payable hereunder, a flat fee of $400 per Office will be assessed for standard office restoration and services disconnections. CW reserves the right to charge additional reasonable fees for any repairs above and beyond normal wear and tear.

5.8. For a period of 30 days after the termination of this Agreement, CW will forward Client's mail to an address provided in writing by Client at no charge, other than the postage + a 25% handling fee, and shall place a recorded message on Client's telephone line providing Client's new telephone number, as provided by Client in writing to CW, at no charge, other than a one-time set-up fee of $15.00.  Thereafter, CW shall have no obligation whatsoever to forward mail to Client or provide phone service unless Client enters into a "recorded message" or "mail only" program pursuant to a separate agreement. In the event Client does not (i) provide CW with a forwarding address and/or new telephone number upon the expiration or earlier termination of this Agreement, or (ii) enter into a "recorded message" and/or "mail only" program after the expiration of the above-referenced 30-day period, then Client agrees that within five business days after the termination of this Agreement, Client will cease using, advertising and/or disseminating the telephone number and/or permanent business address CW provided to Client or CW will immediately demand a fee of $100.00 per week until Client ceases using such telephone number and/or permanent business address. The terms of this section shall survive the expiration or earlier termination of this Agreement.  Other than as set forth in this Section 5.7, Client releases CW from any liability arising or incurred in connection with and mail or packages received on Client's behalf.

5.9. If Client continues to occupy the Office after this Agreement has ended, Client will be responsible for any loss, claim or liability CW incur as a result of Client's failure to vacate on time.  CW may, at CW's discretion, permit Client an extension subject to a surcharge on the Monthly Office Charge.

5.10. If the Center is made unusable in whole or in part by fire or other casualty or condemnation, CW may, at CW's option, either terminate this Agreement upon notice to Client, or repair the Center.  In such event, the Monthly Fees shall be abated on a per diem basis with respect to the portions of the accommodations that are unusable or not provided, which will be Client's sole remedy.


# 6.  LIABILITY:

6.1. To the maximum extent permitted by applicable law, CW is not liable to Client in respect of any loss or damage Client suffers in connection with this Agreement or in connection with the services or the accommodations unless CW has acted deliberately or

**CARR**
WORKPLACES

negligently in causing that loss or damage.  CW is not liable for any loss or damage as a result of CW's failure to provide any service under this Agreement as a result of mechanical breakdown, strike, termination of CW's Lease, or otherwise, unless CW does so deliberately or is negligent in connection therewith.  In no event will CW be liable for any loss or damage until Client provides CW with written notice and gives CW reasonable time to cure.  If CW is liable for failing to provide Client with any service under this Agreement, then subject to Section 6.2 below, CW will pay any actual and reasonable expenses Client incurred in obtaining that service from an alternative source up to a maximum equal to 125% of the total fees paid between the date Client executes this Agreement and the date on which the claim in question arises, or $100,000, whichever is higher.  If Client believes CW has failed to deliver a service consistent with this Agreement, Client can provide CW written notice of such failure and give CW a reasonable period of time to cure such failure.

6.2. CW WILL NOT UNDER ANY CIRCUMSTANCES HAVE ANY LIABILITY FOR LOSS OF BUSINESS, LOSS OF PROFITS, LOSS OF ANTICIPATED SAVINGS, LOSS OF OR DAMAGE TO DATA OR ANY CONSEQUENTIAL DAMAGES.

6.3. Client assumes all risk of loss with respect to Client's personal property and Client's agents, employees and invitees within the Center or the building.  During the term of this Agreement, Client will maintain with a respectable insurer licensed to do business in the state and subject to CW's approval (a) all risk property insurance covering Client's property and (b) comprehensive general liability insurance of no less than $1,000,000, with CW, the Landlord and any other parties designated by CW named as additional insured.  Client will deliver certificates of insurance to CW evidencing such coverage prior to the commencement of this Agreement and any expiration date of such policy.

6.4. To the extent that the party sustaining a loss by fire or other casualty to its property is compensated by insurance, CW and Client will each waive all rights of recovery against the other party and no third party shall have any right of recovery.

6.5. Notwithstanding any term to the contrary, CW shall not be held liable to Client under this Agreement if CW is prevented from, or delayed in, performing CW's obligations under this Agreement or from carrying on CW's business by acts, events, omission or accidents beyond CW's reasonable control, including (without limitation): strikes, failure of a utility service or network; act of God, war, riot, civil commotion, disease or quarantine restrictions in compliance with any law or governmental rule, regulation or direction, accident, fire, floor or storm or default of suppliers or subcontractors.  CW's obligation to perform its obligations under this Agreement shall be suspended during the period required to remove such force majeure event.

6.6. To the fullest extent permitted by law,  Client agrees to hold CW, its agents, employees, contractors, officers, directors and Landlord harmless from and against any and all claims of loss, costs, liability and expense, including reasonable attorneys' fees and disbursements (the "Claims"), arising from or alleged to arise from (a) any default by Client hereunder, (b) the use or occupancy of the Center by Client or any person claiming under Client, (c) Client's negligence or the negligence of Client's agents, employees, contractors, officers or directors, except to the extent such Claim results from CW's gross negligence or willful misconduct.  To the fullest extent permitted by law, CW agrees to hold Client, its agents, employees, contractors, officers and directors harmless from and against any and all Claims arising from or alleged to arise from CW's negligence or the negligence of CW's agents, employees, contractors, officers or directors, except to the extent such Claim results from Client's gross negligence or willful misconduct, and excluding any damage or loss to personal property of Client.  The foregoing indemnifications shall survive the expiration or termination of the Agreement.

# Center Rules and Regulations

Client agrees to comply with the following Center Rules and Regulations:

1. Noise levels shall be conducive to a professional environment and shall not interfere with or disturb other clients.
2. Neither Client nor its employees, agents, representatives or invitees shall participate in any type of harassing or disruptive behavior, whether verbal or physical, in the Center or within the building.
3. Client and Client's guests shall conduct themselves in a businesslike manner.
4. Canvassing, soliciting and peddling in the Center or building are prohibited and Client shall not solicit other clients for any business or other purpose without CW prior written approval.
5. Professional attire must be worn at all times.
6. Cell phone use is not permitted in the halls, reception area, cafés, or any other common area.
7. Common areas, including the conference rooms, kitchen and reception area, are for the use of all clients.  Client is required to leave these areas clean after each use.  Client is responsible for their own dishes and disposal of garbage.
8. Client is prohibited from conducting meetings in any common areas, cafes, or vacant offices, other than reserved conference rooms or day offices.
9. The café cannot be used as a substitute or additional office or workstation for Client or Client's guests.  Working in the café for more than 10 hours per month is prohibited. This courtesy is only extended at your home center.
10. All corridors, halls, elevators & stairways shall not be obstructed or used for any purpose other than normal egress and ingress.
11. Plumbing, fixtures and appliances shall be used only for the purposes for which designed, and no sweepings, rubbish, rags or other unsuitable material shall be thrown or deposited therein.  Damage resulting to any fixtures or appliances from misuse by Client or its agents, employees or invitees, shall be paid by Client.
12. Client must not conduct a mechanical business, do any cooking, or use or allow the following to be used:  oil burning fluids, gasoline, kerosene for heating, warming or lighting.  No article deemed hazardous on account of fire or any explosive shall be brought in the Center.  No offensive gases, odors or liquids are permitted.
13. Movement in or out of the building of furniture, office equipment, bulky material, merchandise or materials which require use of elevators or stairways, or movement through the Building entrances or lobby, will be conducted under CW's supervision at such times and in such a manner as CW may reasonably require.  Client is liable for all damages including the articles moved, CW's equipment & property, and injury to anyone engaged or not engaged in such movement, including CW personnel.
14. Before leaving the office unattended, Client will close and securely lock all doors.  Any damage resulting from failure to do so will be paid by Client.
15. No advertisement, identifying signs, personal items or artwork or other notices shall be inscribed, painted or affixed on any part of the corridors, doors, office windows, common areas or cubicles without CW prior written approval.
16. Client cannot prop open any corridor doors, exit doors or doors connecting corridors during or after business hours.
17. Client cannot modify existing locks or install additional locks or bolts of any kind on any of the doors or windows of any offices or within the Center.
18. CW is not responsible for lost or stolen personal property, money or jewelry from Client's office or public or common areas regardless of whether such loss occurs when the area is locked against entry or not.
19. Client will not conduct any activity within the Center or building, which in CW's sole judgment or the judgment of Landlord, will create excessive traffic or is inappropriate to a shared office environment.
20. If Client occupies a cubicle(s) in view of any common areas, Client is required to keep the areas clear.  All boxes and filing cabinets should be stored in an orderly fashion and out of view of the common area.
21. This is a non-smoking facility and smoking is prohibited everywhere within the Center.
22. No alcoholic beverages are permitted on the premises, without CW's prior approval.
23. Conference Room hours included on the first page of your Agreement are for use at you home center, and can be used on occasion at other centers within the CW portfolio. No free hours can be used in any Manhattan location and a you may only use up to 50% of your free monthly hours in CW San Francisco locations. Restrictions apply to the type of rooms available for use. Please check with a team member prior to booking for clarification
24. Illegal firearms and weapons are prohibited.

CW has no responsibility to Client for the violation or non-performance by any other clients of any of these Rules and Regulations or the Terms & Conditions, but shall use reasonable efforts to uniformly enforce all Rules and Regulations and Terms & Conditions.



# GUARANTY

Richard Sands  ("Guarantor"), as an equity owner of Ponderosa Energy LLC ("Client") irrevocably and unconditionally guarantees to  PBC 745 Fifth Avenue, LLC, (DBA Carr Workplaces) ("CW"), the full and due performance by the Client and by its successors and assigns, of all the terms, obligations, covenants and agreements under the Agreement attached hereto (the "Agreement"), and each of them, on the part of Client to be observed or performed, and without limiting the foregoing, the full and punctual payment by Client of all Monthly Office Charges, Monthly Service Charges, and other sums of money, as and when they become due and payable by Client, as provided in the Agreement, during the full term of the Agreement.  Capitalized terms but not used herein shall have the meanings given such terms in the Agreement.

The undersigned waives notice of acceptance of this Guaranty, and agrees that this Guaranty shall be a continuing obligation of Guarantor and further agrees as follows:

1. Notice of any and all defaults on the part of Client is waived, and consent is given to all extensions of time, waivers or indulgences of any kind, that CW may grant to Client with reference to the performance by Client of any of the terms, obligations, covenants or agreements in or under the Agreement.  Full consent is also given by the undersigned to any and all changes, modifications or amendments in, of or to any such terms, obligations, covenants or agreements as well as to conditions of, in or under the Agreement that may be made by agreement between CW and Client or otherwise; and the undersigned waives any and all requirements whatsoever on the part of CW to first exhaust or pursue its, or their remedies against Client before CW shall have the right to proceed directly, and recover against, the undersigned.
2. The undersigned, without limiting any of the foregoing provisions of this Guaranty, also waives notice of any and all changes, modifications or amendments, in, of or to the Agreement that may be agreed upon between CW and Client or that may be permitted or suffered in connection with the agreement, or the performance thereof, as well as notice of any waivers, indulgences or extensions granted or suffered by CW.  The undersigned further agrees that, notwithstanding any waivers, extensions or indulgences granted or suffered by CW, and notwithstanding any changes, amendments or modifications, in or to the Agreement, by agreement or otherwise, the undersigned shall be and remain, and is absolutely and fully liable to CW under this Guaranty.
3. The undersigned further agrees that this Guaranty, and the obligations of the undersigned under it, shall in no way be terminated, affected or impaired by reason of the assertion by CW against Client of any rights or remedies reserved to CW pursuant to or by virtue of the provisions of the Agreement.
4. All of the foregoing agreements of the undersigned contained in this Guaranty, and each of them shall be binding upon the undersigned, its successors and assignees, and shall inure to the benefit of CW, its successors and assigns.  The undersigned may not assign its obligations under this Guaranty without the prior written consent of CW.
5. This Guaranty is executed by the undersigned prior to, or simultaneously with, the execution and delivery of the Agreement by CW, and to induce CW to execute and deliver the Agreement well knowing that the CW would not do so without this Guaranty.

Guarantor listed above has caused this Guaranty to be executed on this date: June 23 2016

Signature: _____
Richard sands (Jun 26, 2016)



# OFFICE SERVICE AGREEMENT

This Office Service Agreement ("Agreement"), dated December 15 2016, is between **PBC 745 Fifth Avenue, LLC (dba Carr Workplaces)** ("CW") having an address at 745 Fifth Avenue, Suite 500 New York, NY 10151 (the "Center") and **Ponderosa Energy LLC**, a Delaware Limited Liability Company**,** ("Client") having an address at 15 Valley Drive Greenwich, CT 06831.

In consideration of the covenants and fees set forth herein and subject to the Terms & Conditions attached hereto, CW shall grant Client a license to use one or more offices in the Center (referred to herein as the "Office"), and the facilities and services of the Center (together with the Office, sometimes collectively referred to herein as the "accommodation"), upon and subject to the terms set forth below.

The basic terms of this Agreement are as follows:

**INITIAL TERM, OFFICE & MONTHLY CHARGES:**

| Agreement Term (months): | Office Numbers: | Start & End Dates: | # of Occupants | |
|---|---|---|---|---|
| 3 | Exterior 537 | 1/1/2017-3/31/2017 | 5 | |
| | | | **Monthly Office Charges:** | $6,100.00 |
| **# Ala carte service (please specify):** | **Quantity** | **Unit Rate (mo):** | | **Monthly Service Charge:** |
| | | | **Total  Monthly Fixed Fees:¹** | $6,100.00 |
| **Monthly Office Charge includes:** | 5 x multi-line handset with unlimited local and domestic LD usage, 5 x high speed internet connection, unlimited faxing, B&W copies ,  B&W prints and scans, lobby listing, access to Community Café with free gourmet coffee for office occupants and guests PLUS any additional a'la carte services listed above. | | | |

| SUMMARY OF FEES | |
|---|---|
| Setup Fees @ $0 per/occupant: | $0.00 |
| Retainer @ 1 x Monthly Office Charge ($6100 required less $5800 on file): | $300.00 |
| **TOTAL DUE  AT SIGNING:** | **$6,400.00** |

*¹ Any applicable state or local sales taxes will be reflected on each monthly invoice*

| Description of any included furnishings: | 5 x workstations, 5 x two-drawer pedestals and 5 x desk chairs |
|---|---|

| Nature of Client's business: | Finance |
|---|---|

**Term and Commencement of Services:  This Agreement commences and expires on the dates specified above.**

The following Terms & Conditions, the Center Rules and Regulations attached hereto, and any attached Addenda are incorporated into and made a part of this Agreement and the parties hereto agree to be legally bound thereby.

**IN WITNESS WHEREOF**, both parties have duly executed this Service / License Agreement as of the day and year indicated below.

**PBC 745 Fifth Avenue, LLC, dba Carr Workplaces**
**By:  Preferred Group, LLC, its authorized agent**

By:  _____

Name:   Gregg de los Reyes

Title:   General Manager

Date:  _____

**Ponderosa Energy LLC**

By:  *richard sands*
       richard sands (Dec 21, 2016)

Name:   Richard Sands

Title:   member manager

Date:   Dec 21, 2016

*Rev 7.15.13 SF*

# TERMS & CONDITIONS

1. **NATURE OF THE AGREEMENT:**

   1.1. This Agreement is the commercial equivalent of an Agreement for an accommodation in a hotel. The Center remains CW's property and in CW's possession and control. Client acknowledges that this Agreement is a license agreement and creates no tenancy interest, leasehold estate or other real property interest with respect to the accommodation and shall not be deemed or construed in any way to create a partnership or relationship of landlord and tenant between the parties hereto. CLIENT HEREBY WAIVES ANY AND ALL NOTICES TO CURE (EXCEPT AS EXPRESSLY SET FORTH IN SECTION 5.1 HEREOF), VACATE OR QUIT THE OFFICE.

   1.2. The Agreement is personal to Client and cannot be transferred or assigned to any other party, unless written request of such assignment is submitted to CW and CW agrees to such assignment, which will be at our sole discretion, and Client will not permit occupancy or use of any part of the Office or the Center by any persons other than Client, its agents and employees.

   1.3. Subject to all Terms & Conditions, Center Rules and Regulations, Exhibits and any Addenda, CW is granting Client a license for the use of the accommodations specified on the first page of this Agreement. All utilities, including any telephones and IT/data connection(s) as outlined on the first page of this Agreement, shall be provided to the accommodation without additional expense to Client. It is agreed that the Office is intended for the use of the total number of occupants listed on the first page of this Agreement. Should Client increase the number of occupants without CW's written approval, Client shall be charged additional fees as set forth on the Services Price List (as amended from time to time).

   1.4. This Agreement provides for Client's exclusive use of the Office as outlined on the first page of this Agreement, and for the shared, non-exclusive use of the common areas of the Center. When Client takes occupancy of the Office, CW will prepare an Inventory List for Client to confirm receipt of keys and/or entry cards and the condition of the Office and furniture. CW will deliver the Office and furniture in its "as is" condition at the commencement of the Agreement. CW makes no representations or warranties with respect to the Office, the furniture or the Center. By taking possession of the Office, Client acknowledges that the Office and the furniture are in good and satisfactory condition at the time of possession. If CW is unable to deliver possession of the Office at the commencement of the Agreement for any reason, this Agreement and Client's obligations hereunder will not be affected, except that Client shall not be required to pay any sums until CW delivers possession of the Office to Client.

   1.5. In the event the Center is no longer available and CW is permanently unable to provide the accommodations at the Center as stated in this Agreement, this Agreement will end and Client will only be obligated to pay monthly fees up to the date this Agreement ends and for the additional services Client has used. In such event, CW will try to find suitable alternative accommodations for Client at another center.

   1.6. CW will provide the number of serviced Office(s) in the Center for which Client has agreed to pay as stated in this Agreement. This Agreement lists the specific Office(s) CW has initially allocated for Client's use. CW may need to allocate different Office(s) of equal size from time to time upon not less than 30 days prior notice to Client. CW will pay any reasonable expenses incurred in connection with such relocation of Client's property.

   1.7. CW can enter Client's Office at any time. However, unless there is an emergency CW will, as a matter of courtesy, inform Client no less than 24 hours in advance either verbally or electronically when access is needed to the Office to carry out testing, repairing or work other than routine inspection, cleaning and maintenance. CW will endeavor to respect reasonable security procedures to protect the confidentiality of Client's business.

   1.8. Client, its agents, employees and invitees, agree to abide by and observe the rules and regulations of CW's lease (the "Lease") with the owner of the building ("Landlord") in which the Center is located. Client's Agreement is subordinate to the Lease and to any other agreements to which the Lease is subordinate. This Agreement terminates, if not earlier, simultaneously with the expiration or sooner termination of the Lease for any reason. Client does not have any rights under the Lease (and all requests for building services shall be directed solely to CW), although Client will attorn to Landlord in such cases as may be required by the terms of the Lease or requested by CW or Landlord.

   1.9. CW may assign this Agreement and Client agrees to accept any such assignee. Upon any such assignment, CW will be discharged from all liability hereunder.

   1.10. While this Agreement is in effect and for a period of six months after this Agreement ends, both parties agree not to solicit or offer employment to any of the other's current employees or anyone who has left either party's employment in the last 90 days. In the event that a breach of this covenant occurs, the breaching party agrees to pay, as liquidated damages, a sum of money equal to 100% of the employee's annual wages for each such breach.

   1.11. Client acknowledges and agrees that the terms of this Agreement and the relationship of the parties under this Agreement are confidential. Neither party may disclose them without the other's consent unless required to do so by law or an official authority. This obligation continues after this Agreement ends.

   1.12. All notices or other communications, except for service of process, must be in writing and shall be deemed duly given if delivered in person, or by a nationally-recognized commercial delivery service.

   1.13. This Agreement shall be interpreted under the laws of the jurisdiction in which the Center is located. CLIENT HEREBY EXPRESSLY AND KNOWINGLY WAIVES ANY AND ALL RIGHT TO A JURY TRIAL IN ANY ACTION OR SUIT ARISING OUT OF THIS AGREEMENT OR THE PERFORMANCE OR NON-PERFORMANCE HEREOF.

**CARR**
WORKPLACES

1.14. Client must pay any reasonable and proper costs including legal fees that CW incurs in enforcing this Agreement.

1.15. This Agreement supersedes any prior agreement and embodies the entire agreement between Client and CW.  This Agreement is an arm's length transaction between disinterested parties.  There shall be no presumption of construction against the drafter of this Agreement.

1.16. Client and CW acknowledge and agree that neither Landlord, nor Landlord's agent, are parties to this Agreement and neither of them shall have any contractual liability or duty to Client by virtue of this Agreement, and that this Agreement shall not affect the rights and obligations between CW and Landlord.

2. **USE AND OCCUPANCY:**

2.1. Client agrees to use and occupy the Office solely for general office purposes. Client will only conduct business in the name as stated on the first page of this Agreement or some other name that CW has previously approved in writing.

2.2. Client agrees to comply, at its expense, with all applicable laws, orders, regulations and rules, pertaining to the use and occupancy of the Office, and the conduct of Client's business.  Client must conduct its business so as not to interfere with the use of the Center by CW, its employees, the other clients of the Center, and the tenants of the Building and so as not to detract from the appearance of the Center.  Client must comply with CW's safety standards, with the Center Rules and Regulations attached hereto and the building's rules and regulations (copies of which are on file in the Manager's office).  Client may not cause any nuisance or annoyance, cause the increase of insurance premiums CW has to pay, or cause loss or damage to CW (including damage to CW's reputation) or to CW's Landlord.  Client acknowledges that (a) the terms of the this Section 2.2 are a material inducement in CW's execution of the Agreement and (b) any violation by Client of this Section 2.2 shall constitute a material default by Client hereunder, entitling CW to terminate this Agreement without further notice or procedure.

2.3. Client agrees to pay promptly (i) all sales, use, excise, consumption and any other taxes and license fees which Client is required to pay to any governmental authority (and, at CW's request, will provide evidence of such payment) and (ii) any taxes paid by CW to any governmental authority that are attributable to this Agreement, or the accommodations provided hereunder, including, without limitation, any gross receipts, rent and occupancy taxes, or tangible personal property taxes.

2.4. Client shall make no alterations or modifications in or to the Office, including, without limitation, affixing any signs or postings, and any door locks, without CW's prior written consent (which CW may grant or withhold in its sole discretion).  In the event that alterations or modifications are made without CW's prior written consent, CW may, at CW's option, correct or remove the same at Client's sole cost and expense.

2.5. All keys and entry cards remain CW's property and shall not be duplicated or transferred to third parties. The loss of keys or cards must immediately be reported to CW. Client will be responsible for the cost of lost keys or cards as well as the cost of changing locks.

2.6. Client may not have any advertising of any type using the address of the Center without CW's prior written consent (which CW may grant or withhold in its sole discretion). Use of the address on business cards, websites, and other standard business practices are acceptable without written consent.

2.7. Client acknowledges that CW will comply with the USPS regulations regarding Client's mail.  Client must also comply with all USPS regulations.  Failure to comply will result in immediate termination of this Agreement.

2.8. Client shall not, without CW's prior written consent (which CW may grant or withhold in its sole discretion), store or operate any computer equipment (except personal computer equipment) or any other large business machines, reproduction equipment, heating equipment, stove, mechanical amplification equipment, vending or coin-operated machines, refrigerator or coffee equipment.

2.9. Client may not install any cabling, IT or telecom connections without CW's prior written consent (which CW may grant or withhold in its sole discretion).  As a condition of CW consent, Client will permit CW to oversee any installations (for example, IT or electrical systems) to verify that such installations do not interfere with the use of the Center by CW, other clients or Landlord.  CW's consent may also be conditioned upon the payment of additional fees for installation and/or usage of such cabling, and/or the requirement that the Client remove the cabling, etc.  All cables in the ceiling or walls of the Center shall become CW's property.

2.10. The electrical current shall be used for ordinary lighting, powering personal computer equipment and small appliances only.  If Client requires any special installation or wiring for electrical use, telephone equipment or otherwise, such wiring shall be done with CW's prior written approval, at Client's sole expense by a company approved by CW.  Client shall not install or operate any equipment or machinery that requires a separate electrical circuit or consumes higher than normal and reasonable quantities of electricity.

3. **FEES & SERVICES**

3.1. All Total Monthly Fixed Fees stated on the first page of this Agreement shall remain in effect throughout the initial term, or one year from the date of this Agreement, whichever period is shorter.  Thereafter, the Monthly Office Charge will be adjusted by the percentage outlined in the section entitled "Term and Commencement of Services" on the first page of this Agreement.

3.2. All Total Monthly Fixed Fees are due in advance on the first calendar day of each month for the duration of this Agreement. All payments shall be made without deduction, offset or counterclaim. Fees for additional services are due on the first calendar day of

the month after submission of the invoice to Client for additional services rendered through the 15th day (or such other period) of the previous month.

3.3. Upon Client's request to CW, during normal business hours, CW may provide additional services that are not included within the Monthly Office Charge or the Monthly Service Charge. The fee schedule for additional services is available upon request and may be updated at any time without notice. Client agrees to pay all charges listed on the first page of this Agreement as well as any additional services rendered. CW (and CW's designated vendors) is the only authorized service providers in the Center. If Client defaults under this Agreement, CW may cease providing any services to Client without resorting to legal process.

3.4. A late payment charge equal to 10% of the arrearage shall be due and payable if payment is not received by CW by the 5th day of the month. The amount of the late payment charge shall be the lesser of the amount stated or the highest amount permitted by law. In the event that Client's check is not honored because of insufficient funds, Client will pay CW a $100 fee in addition to all other remedies. In the event that Client's credit card is not honored, Client will pay a $50 fee in addition to all other remedies. A dishonor of Client's check or credit card more than two (2) times during the term of this Agreement shall be an immediate event of default for which no additional notice or cure period shall be required.

3.5. If Client benefited from a special discount, promotion or offer, it was for the initial term only, and CW may discontinue that discount, promotion or offer without notice if Client defaults under this Agreement.

3.6. Client is required to pay a service retainer equivalent to the amount stated on the first page of this Agreement. No interest will be paid on the retainer. This retainer will be held by CW as security for performance of all Client's obligations under this Agreement. If Client fails to perform any of its obligations under this Agreement, CW may apply Client's retainer to the balance due CW and any expenses or liabilities incurred by CW and Client agrees to replenish any portion CW applies. CW may increase the amount of Client's retainer if Client is in arrears in the payment of invoices. The retainer or any balance, after deducting outstanding fees, restoration fees and other costs due to CW, will be returned to Client after Client have settled its account to the address Client has provided to CW. In the event no address has been provided and any portion of Client's retainer is not claimed after 120 days, it will be automatically forfeited to CW.

4. **IT SERVICES AND SUPPORT**:

4.1. Client is responsible for ensuring that Client has adequate protection against viruses through the use of its own virus protection on its systems and hardware, and Client is expected to keep the software current with the latest virus definition files.

4.2. Client is prohibited from engaging in any violations of system or network security. Internet access may not be used in connection with attempts – whether or not successful – to violate the security of a network, service or other system. Examples of prohibited activities include, without limitation: hacking, cracking into, monitoring or using systems without authorization, scanning ports, conducting denial of service attacks, and distributing viruses or other harmful software. CW may disconnect Client's equipment and withhold services if CW determines that Client's hardware or software is, or has become, inappropriate for connection to CW's network or otherwise violates this provision.

4.3. Staff time spent on prohibited activities or policy violations can be initiated at Client's expense on an emergency basis without Client's permission and without an estimate or limit. CW will make a good faith effort to minimize the amount of billable time CW spends on an emergency basis. If CW is diagnosing a problem reported by another customer and find that the problem is caused by Client, Client will be billed for the time spent diagnosing that problem.

4.4. Client agrees not to perform any illegal or inappropriate uses identified by CW's network administrator.

4.5. Client's IT equipment or host servers can be co-located within CW's data room (as space permits) at a monthly fee per device. Client agrees to coordinate the removal of its IT equipment from the data room upon termination or expiration of this Agreement. Access to equipment that is co-located in CW's IT room is available during normal business hours. For security reasons, an employee or IT staff person of CW must supervise Client while Client is in CW's IT room and applicable charges will apply.

4.6. If Client uses excessive amounts of bandwidth or abuses the use of the shared network, Client will be notified and additional charges for high bandwidth usage will apply.

4.7. Client may connect Wireless Access Points to the network jacks in Client's Office upon CW's prior approval but such Wireless Access Points may not be used primarily as a means to circumvent network jack charges. Additional fees may apply.

4.8. Internet connectivity provided cannot be used for VoIP service without CW's prior written approval.

5. **DEFAULT AND TERMINATION**:

5.1. CW may terminate this Agreement immediately by giving Client notice and without need to follow any additional procedures if: (a) Client becomes insolvent, bankrupt, goes into liquidation or becomes unable to pay its debts as they become due, or (b) Client is in breach of one of Client's obligations under this Agreement which cannot be cured or which CW has given Client notice to cure and which Client has failed to cure within five (5) days of such notice, or (c) Client's conduct or that of someone at the Center, with Client's permission or invitation, is incompatible with ordinary office use.

5.2.    CW shall have the right to terminate the Agreement immediately if Client is or becomes (i) identified on the Specially Designated Nationals and Blocked Person List maintained by the U.S. Department of the Treasury Office of Foreign Assets Control or any similar list or (ii) a person, entity, or government with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation or Executive order of the President of the United States.

5.3.    If CW terminates the Agreement for any of the reasons described in the immediately preceding paragraphs, Client shall remain responsible for its outstanding obligations under this Agreement.  Client may, in addition to any other obligations contained herein, be required to:

*   Pay for additional services Client has used;
*   Pay the Monthly Office Charge for the remainder of the period for which Client's agreement would have lasted had CW not ended it, or for a further period of three months, whichever is longer; and,
*   Forfeit Client's Retainer.

In such event, CW may also take possession of the Office.

5.4.    A waiver by either CW or Client of a breach (or series of breaches) of any covenant or obligation under this Agreement of the other party shall not be construed to be a waiver of any other covenant or obligation or of any subsequent breach of the same covenant or obligation.  Notwithstanding the CW's reservation of any particular remedy hereunder, CW hereby reserves each and every remedy available at law or in equity in the event of a breach by Client hereunder.

5.5.    Client agrees that if Client is in default under any agreement with CW or any of its affiliates at any center other than the one specified on the front page of this Agreement, CW may recover any unpaid sums due under such other agreement from Client under this Agreement, and that CW may, in particular (but is not limited to), withhold services under this Agreement or deduct sums from the service retainer held under this Agreement in respect of such unpaid sums.

5.6.    Upon the expiration or termination of the Agreement, Client's right to occupy the Office and use the Center is revoked and Client will remove all of its property and return the Office and furniture in the same condition in which it was delivered to Client, subject to reasonable wear and tear.  Any personal property left in the Office will be considered abandoned and CW may dispose of it without any liability to Client.  All telephone and facsimile numbers are CW's property and cannot be transferred to Client at the expiration or termination of the Agreement.

5.7.    Upon Client's departure or if Client, at Client's option (with CW's prior approval), desires to relocate to a different Office within the Center, in addition to any amounts payable hereunder, a flat fee of $400 per Office will be assessed for standard office restoration and services disconnections. CW reserves the right to charge additional reasonable fees for any repairs above and beyond normal wear and tear.

5.8.    For a period of 30 days after the termination of this Agreement, CW will forward Client's mail to an address provided in writing by Client at no charge, other than the postage + a 25% handling fee, and shall place a recorded message on Client's telephone line providing Client's new telephone number, as provided by Client in writing to CW, at no charge, other than a one-time set-up fee of $15.00.  Thereafter, CW shall have no obligation whatsoever to forward mail to Client or provide phone service unless Client enters into a "recorded message" or "mail only" program pursuant to a separate agreement. In the event Client does not (i) provide CW with a forwarding address and/or new telephone number upon the expiration or earlier termination of this Agreement, or (ii) enter into a "recorded message" and/or "mail only" program after the expiration of the above-referenced 30-day period, then Client agrees that within five business days after the termination of this Agreement, Client will cease using, advertising and/or disseminating the telephone number and/or permanent business address CW provided to Client or CW will immediately demand a fee of $100.00 per week until Client ceases using such telephone number and/or permanent business address. The terms of this section shall survive the expiration or earlier termination of this Agreement.  Other than as set forth in this Section 5.7, Client releases CW from any liability arising or incurred in connection with any mail or packages received on Client's behalf.

5.9.    If Client continues to occupy the Office after this Agreement has ended, Client will be responsible for any loss, claim or liability CW incur as a result of Client's failure to vacate on time.  CW may, at CW's discretion, permit Client an extension subject to a surcharge on the Monthly Office Charge.

5.10.   If the Center is made unusable in whole or in part by fire or other casualty or condemnation, CW may, at CW's option, either terminate this Agreement upon notice to Client, or repair the Center.  In such event, the Monthly Fees shall be abated on a per diem basis with respect to the portions of the accommodations that are unusable or not provided, which will be Client's sole remedy.


# 6.    LIABILITY:

6.1.    To the maximum extent permitted by applicable law, CW is not liable to Client in respect of any loss or damage Client suffers in connection with this Agreement or in connection with the services or the accommodations unless CW has acted deliberately or negligently in causing that loss or damage.  CW is not liable for any loss or damage as a result of CW's failure to provide any service under this Agreement as a result of mechanical breakdown, strike, termination of CW's Lease, or otherwise, unless CW does so deliberately or is negligent in connection therewith.  In no event will CW be liable for any loss or damage until Client provides CW with written notice and gives CW reasonable time to cure.  If CW is liable for failing to provide Client with any service under this Agreement, then subject to Section 6.2 below, CW will pay any actual and reasonable expenses Client incurred in obtaining that



service from an alternative source up to a maximum equal to 125% of the total fees paid between the date Client executes this Agreement and the date on which the claim in question arises, or $100,000, whichever is higher.  If Client believes CW has failed to deliver a service consistent with this Agreement, Client can provide CW written notice of such failure and give CW a reasonable period of time to cure such failure.

6.2.    CW WILL NOT UNDER ANY CIRCUMSTANCES HAVE ANY LIABILITY FOR LOSS OF BUSINESS, LOSS OF PROFITS, LOSS OF ANTICIPATED SAVINGS, LOSS OF OR DAMAGE TO DATA OR ANY CONSEQUENTIAL DAMAGES.

6.3.    Client assumes all risk of loss with respect to Client's personal property and Client's agents, employees and invitees within the Center or the building.  During the term of this Agreement, Client will maintain with a respectable insurer licensed to do business in the state and subject to CW's approval (a) all risk property insurance covering Client's property and (b) comprehensive general liability insurance of no less than $1,000,000, with CW, the Landlord and any other parties designated by CW named as additional insured.  Client will deliver certificates of insurance to CW evidencing such coverage prior to the commencement of this Agreement and any expiration date of such policy.

6.4.    To the extent that the party sustaining a loss by fire or other casualty to its property is compensated by insurance, CW and Client will each waive all rights of recovery against the other party and no third party shall have any right of recovery.

6.5.    Notwithstanding any term to the contrary, CW shall not be held liable to Client under this Agreement if CW is prevented from, or delayed in, performing CW's obligations under this Agreement or from carrying on CW's business by acts, events, omission or accidents beyond CW's reasonable control, including (without limitation): strikes, failure of a utility service or network; act of God, war, riot, civil commotion, disease or quarantine restrictions in compliance with any law or governmental rule, regulation or direction, accident, fire, floor or storm or default of suppliers or subcontractors. CW's obligation to perform its obligations under this Agreement shall be suspended during the period required to remove such force majeure event.

6.6.    To the fullest extent permitted by law,  Client agrees to hold CW, its agents, employees, contractors, officers, directors and Landlord harmless from and against any and all claims of loss, costs, liability and expense, including reasonable attorneys' fees and disbursements (the "Claims"), arising from or alleged to arise from (a) any default by Client hereunder, (b) the use or occupancy of the Center by Client or any person claiming under Client, (c) Client's negligence or the negligence of Client's agents, employees, contractors, officers or directors, except to the extent such Claim results from CW's gross negligence or willful misconduct.  To the fullest extent permitted by law, CW agrees to hold Client, its agents, employees, contractors, officers and directors harmless from and against any and all Claims arising from or alleged to arise from CW's negligence or the negligence of CW's agents, employees, contractors, officers or directors, except to the extent such Claim results from Client's gross negligence or willful misconduct, and excluding any damage or loss to personal property of Client.  The foregoing indemnifications shall survive the expiration or termination of the Agreement.



# Center Rules and Regulations

Client agrees to comply with the following Center Rules and Regulations:

1. Noise levels shall be conducive to a professional environment and shall not interfere with or disturb other clients.
2. Neither Client nor its employees, agents, representatives or invitees shall participate in any type of harassing or disruptive behavior, whether verbal or physical, in the Center or within the building.
3. Client and Client's guests shall conduct themselves in a businesslike manner.
4. Canvassing, soliciting and peddling in the Center or building are prohibited and Client shall not solicit other clients for any business or other purpose without CW prior written approval.
5. Professional attire must be worn at all times.
6. Cell phone use is not permitted in the halls, reception area, cafés, or any other common area.
7. Common areas, including the conference rooms, kitchen and reception area, are for the use of all clients. Client is required to leave these areas clean after each use. Client is responsible for their own dishes and disposal of garbage.
8. Client is prohibited from conducting meetings in any common areas, cafes, or vacant offices, other than reserved conference rooms or day offices.
9. The café cannot be used as a substitute or additional office or workstation for Client or Client's guests. Working in the café for more than 10 hours per month is prohibited. This courtesy is only extended at your home center.
10. All corridors, halls, elevators & stairways shall not be obstructed or used for any purpose other than normal egress and ingress.
11. Plumbing, fixtures and appliances shall be used only for the purposes for which designed, and no sweepings, rubbish, rags or other unsuitable material shall be thrown or deposited therein. Damage resulting to any fixtures or appliances from misuse by Client or its agents, employees or invitees, shall be paid by Client.
12. Client must not conduct a mechanical business, do any cooking, or use or allow the following to be used: oil burning fluids, gasoline, kerosene for heating, warming or lighting. No article deemed hazardous on account of fire or any explosive shall be brought in the Center. No offensive gases, odors or liquids are permitted.
13. Movement in or out of the building of furniture, office equipment, bulky material, merchandise or materials which require use of elevators or stairways, or movement through the Building entrances or lobby, will be conducted under CW's supervision at such times and in such a manner as CW may reasonably require. Client is liable for all damages including the articles moved, CW's equipment & property, and injury to anyone engaged or not engaged in such movement, including CW personnel.
14. Before leaving the office unattended, Client will close and securely lock all doors. Any damage resulting from failure to do so will be paid by Client.
15. No advertisement, identifying signs, personal items or artwork or other notices shall be inscribed, painted or affixed on any part of the corridors, doors, office windows, common areas or cubicles without CW prior written approval.
16. Client cannot prop open any corridor doors, exit doors or doors connecting corridors during or after business hours.
17. Client cannot modify existing locks or install additional locks or bolts of any kind on any of the doors or windows of any offices or within the Center.
18. CW is not responsible for lost or stolen personal property, money or jewelry from Client's office or public or common areas regardless of whether such loss occurs when the area is locked against entry or not.
19. Client will not conduct any activity within the Center or building, which in CW's sole judgment or the judgment of Landlord, will create excessive traffic or is inappropriate to a shared office environment.
20. If Client occupies a cubicle(s) in view of any common areas, Client is required to keep the areas clear. All boxes and filing cabinets should be stored in an orderly fashion and out of view of the common area.
21. This is a non-smoking facility and smoking is prohibited everywhere within the Center.
22. No alcoholic beverages are permitted on the premises, without CW's prior approval.
23. Conference Room hours included on the first page of your Agreement are for use at you home center, and can be used on occasion at other centers within the CW portfolio. No free hours can be used in any Manhattan location and a you may only use up to 50% of your free monthly hours in CW San Francisco locations. Restrictions apply to the type of rooms available for use. Please check with a team member prior to booking for clarification
24. Illegal firearms and weapons are prohibited.

CW has no responsibility to Client for the violation or non-performance by any other clients of any of these Rules and Regulations or the Terms & Conditions, but shall use reasonable efforts to uniformly enforce all Rules and Regulations and Terms & Conditions.



# GUARANTY

Richard Sands   ("Guarantor"), as an equity owner of Ponderosa Energy LLC ("Client") irrevocably and unconditionally guarantees to  PBC 745 Fifth Avenue, LLC, (DBA Carr Workplaces) ("CW"), the full and due performance by the Client and by its successors and assigns, of all the terms, obligations, covenants and agreements under the Agreement attached hereto (the "Agreement"), and each of them, on the part of Client to be observed or performed, and without limiting the foregoing, the full and punctual payment by Client of all Monthly Office Charges, Monthly Service Charges, and other sums of money, as and when they become due and payable by Client, as provided in the Agreement, during the full term of the Agreement.  Capitalized terms but not used herein shall have the meanings given such terms in the Agreement.

The undersigned waives notice of acceptance of this Guaranty, and agrees that this Guaranty shall be a continuing obligation of Guarantor and further agrees as follows:

1.  Notice of any and all defaults on the part of Client is waived, and consent is given to all extensions of time, waivers or indulgences of any kind, that CW may grant to Client with reference to the performance by Client of any of the terms, obligations, covenants or agreements in or under the Agreement.  Full consent is also given by the undersigned to any and all changes, modifications or amendments in, of or to any such terms, obligations, covenants or agreements as well as to conditions of, in or under the Agreement that may be made by agreement between CW and Client or otherwise; and the undersigned waives any and all requirements whatsoever on the part of CW to first exhaust or pursue its, or their remedies against Client before CW shall have the right to proceed directly, and recover against, the undersigned.

2.  The undersigned, without limiting any of the foregoing provisions of this Guaranty, also waives notice of any and all changes, modifications or amendments, in, of or to the Agreement that may be agreed upon between CW and Client or that may be permitted or suffered in connection with the agreement, or the performance thereof, as well as notice of any waivers, indulgences or extensions granted or suffered by CW.  The undersigned further agrees that, notwithstanding any waivers, extensions or indulgences granted or suffered by CW, and notwithstanding any changes, amendments or modifications, in or to the Agreement, by agreement or otherwise, the undersigned shall be and remain, and is absolutely and fully liable to CW under this Guaranty.

3.  The undersigned further agrees that this Guaranty, and the obligations of the undersigned under it, shall in no way be terminated, affected or impaired by reason of the assertion by CW against Client of any rights or remedies reserved to CW pursuant to or by virtue of the provisions of the Agreement.

4.  All of the foregoing agreements of the undersigned contained in this Guaranty, and each of them shall be binding upon the undersigned, its successors and assignees, and shall inure to the benefit of CW, its successors and assigns.  The undersigned may not assign its obligations under this Guaranty without the prior written consent of CW.

5.  This Guaranty is executed by the undersigned prior to, or simultaneously with, the execution and delivery of the Agreement by CW, and to induce CW to execute and deliver the Agreement well knowing that the CW would not do so without this Guaranty.

Guarantor listed above has caused this Guaranty to be executed on this date: December 15 2016

Signature: *richard sands*
richard sands (Dec 21, 2016)

# ADDENDUM

This Addendum dated December 15, 2016 shall be attached to and form a part of the Office Service Agreement dated December 15, 2016 by and between, **PBC 745 Fifth Avenue, LLC,** d/b/a/ Carr Workplaces ("CW") and **Ponderosa Energy LLC** ("Client)**.**

The following are additional provisions and/or modifications to the foregoing and annexed Office Service Agreement.  In the event of any inconsistency between the provisions of this Addendum and the provisions of the foregoing and annexed Office Service Agreement, the provisions of this Addendum shall prevail.  Except as otherwise defined herein, all capitalized terms shall have the same meaning as set forth in the Office Service Agreement.

## Reduction in service retainer
The Retainer will be equal to one times the fixed monthly fees, for a total of $6100. However, if any monthly payment by Client is received past the due date, an additional one month retainer will be required immediately and will be retained for the duration of the Agreement.

**IN WITNESS WHEREOF,** both parties have executed this instrument by the proper persons duly authorized to do so on the day and year indicated below.

**PBC 745 Fifth Avenue, LLC,  dba Carr Workplaces**

**By:  Preferred Group, LLC, its authorized agent**


**Ponderosa Energy LLC**


By:

Name: Gregg de los Reyes

Title:   General Manager

Date:

By:  *richard sands*
richard sands (Dec 21, 2016)

Name:   Richard Sands

Title:   member manager

Date:   Dec 21, 2016

*Rev 3.1.2015*



# OFFICE SERVICE AGREEMENT

This Office Service Agreement ("Agreement"), dated March 29 2017, is between **PBC 745 Fifth Avenue, LLC (dba Carr Workplaces)** ("CW") having an address at 745 Fifth Avenue, Suite 500 New York, NY 10151 (the "Center") and **Ponderosa Energy LLC**, a Delaware Limited Liability Company, ("Client") having an address at 15 Valley Drive Greenwich, CT 06831.

In consideration of the covenants and fees set forth herein and subject to the Terms & Conditions attached hereto, CW shall grant Client a license to use one or more offices in the Center (referred to herein as the "Office"), and the facilities and services of the Center (together with the Office, sometimes collectively referred to herein as the "accommodation"), upon and subject to the terms set forth below.

The basic terms of this Agreement are as follows:

**INITIAL TERM, OFFICE & MONTHLY CHARGES:**

| Agreement Term (months): | Office Numbers: | Start & End Dates: | # of Occupants | |
|---|---|---|---|---|
| 6 | Exterior 537 | 4/1/2017-9/30/2017 | 5 | |
| | | | **Monthly Office Charges:** | $6,100.00 |
| **# Ala carte service (please specify):** | **Quantity** | **Unit Rate (mo):** | | **Monthly Service Charge:** |
| | | | **Total  Monthly Fixed Fees:[1]** | $6,100.00 |
| **Monthly Office Charge includes:** | 5 x multi-line handset with unlimited local and domestic LD usage, 5 x high speed internet connection, unlimited faxing, B&W copies ,  B&W prints and scans, lobby listing, access to Community Café with free gourmet coffee for office occupants and guests PLUS any additional a'la carte services listed above. | | | |

| SUMMARY OF FEES | |
|---|---|
| Setup Fees @ $0 per/occupant: | $0.00 |
| Retainer @ 1 x Monthly Office Charge ($6100 on file): | $0.00 |
| **TOTAL DUE  AT SIGNING:** | **$6,100.00** |

*[1] Any applicable state or local sales taxes will be reflected on each monthly invoice*

| Description of any included furnishings: | 5 x workstations, 5 x two-drawer pedestals and 5 x desk chairs |
|---|---|

| Nature of Client's business: | Finance |
|---|---|

**Term and Commencement of Services:** This Agreement commences and expires on the dates specified above.  This Agreement will be automatically extended for consecutive periods of the same duration as the initial term, at an adjustment of 10% of the Monthly Office Charge, unless and until terminated by either party by delivery of written notice of expiration at least 2 calendar months prior to the date scheduled for expiration of the Agreement, so that the Agreement will end upon the last day of a calendar month.

The following Terms & Conditions, the Center Rules and Regulations attached hereto, and any attached Addenda are incorporated into and made a part of this Agreement and the parties hereto agree to be legally bound thereby.

**IN WITNESS WHEREOF**, both parties have duly executed this Service / License Agreement as of the day and year indicated below.

**PBC 745 Fifth Avenue, LLC, dba Carr Workplaces**
**By:  Preferred Group, LLC, its authorized agent**

**Ponderosa Energy LLC**

By: _____

By: *richard f. sands*
richard f. sands (Mar 29, 2017)

Name: Gregg de los Reyes

Name:   Richard Sands

Title:   General Manager

Title:   member manager

Date: _____

Date:   Mar 29, 2017

*Rev 7.15.13 SF*

**CARR**
WORKPLACES

# TERMS & CONDITIONS

1. **NATURE OF THE AGREEMENT:**

   1.1. This Agreement is the commercial equivalent of an Agreement for an accommodation in a hotel. The Center remains CW's property and in CW's possession and control. Client acknowledges that this Agreement is a license agreement and creates no tenancy interest, leasehold estate or other real property interest with respect to the accommodation and shall not be deemed or construed in any way to create a partnership or relationship of landlord and tenant between the parties hereto. CLIENT HEREBY WAIVES ANY AND ALL NOTICES TO CURE (EXCEPT AS EXPRESSLY SET FORTH IN SECTION 5.1 HEREOF), VACATE OR QUIT THE OFFICE.

   1.2. The Agreement is personal to Client and cannot be transferred or assigned to any other party, unless written request of such assignment is submitted to CW and CW agrees to such assignment, which will be at our sole discretion, and Client will not permit occupancy or use of any part of the Office or the Center by any persons other than Client, its agents and employees.

   1.3. Subject to all Terms & Conditions, Center Rules and Regulations, Exhibits and any Addenda, CW is granting Client a license for the use of the accommodations specified on the first page of this Agreement. All utilities, including any telephones and IT/data connection(s) as outlined on the first page of this Agreement, shall be provided to the accommodation without additional expense to Client. It is agreed that the Office is intended for the use of the total number of occupants listed on the first page of this Agreement. Should Client increase the number of occupants without CW's written approval, Client shall be charged additional fees as set forth on the Services Price List (as amended from time to time).

   1.4. This Agreement provides for Client's exclusive use of the Office as outlined on the first page of this Agreement, and for the shared, non-exclusive use of the common areas of the Center. When Client takes occupancy of the Office, CW will prepare an Inventory List for Client to confirm receipt of keys and/or entry cards and the condition of the Office and furniture. CW will deliver the Office and furniture in its "as is" condition at the commencement of the Agreement. CW makes no representations or warranties with respect to the Office, the furniture or the Center. By taking possession of the Office, Client acknowledges that the Office and the furniture are in good and satisfactory condition at the time of possession. If CW is unable to deliver possession of the Office at the commencement of the Agreement for any reason, this Agreement and Client's obligations hereunder will not be affected, except that Client shall not be required to pay any sums until CW delivers possession of the Office to Client.

   1.5. In the event the Center is no longer available and CW is permanently unable to provide the accommodations at the Center as stated in this Agreement, this Agreement will end and Client will only be obligated to pay monthly fees up to the date this Agreement ends and for the additional services Client has used. In such event, CW will try to find suitable alternative accommodations for Client at another center.

   1.6. CW will provide the number of serviced Office(s) in the Center for which Client has agreed to pay as stated in this Agreement. This Agreement lists the specific Office(s) CW has initially allocated for Client's use. CW may need to allocate different Office(s) of equal size from time to time upon not less than 30 days prior notice to Client. CW will pay any reasonable expenses incurred in connection with such relocation of Client's property.

   1.7. CW can enter Client's Office at any time. However, unless there is an emergency CW will, as a matter of courtesy, inform Client no less than 24 hours in advance either verbally or electronically when access is needed to the Office to carry out testing, repairing or work other than routine inspection, cleaning and maintenance. CW will endeavor to respect reasonable security procedures to protect the confidentiality of Client's business.

   1.8. Client, its agents, employees and invitees, agree to abide by and observe the rules and regulations of CW's lease (the "Lease") with the owner of the building ("Landlord") in which the Center is located. Client's Agreement is subordinate to the Lease and to any other agreements to which the Lease is subordinate. This Agreement terminates, if not earlier, simultaneously with the expiration or sooner termination of the Lease for any reason. Client does not have any rights under the Lease (and all requests for building services shall be directed solely to CW), although Client will attorn to Landlord in such cases as may be required by the terms of the Lease or requested by CW or Landlord.

   1.9. CW may assign this Agreement and Client agrees to accept any such assignee. Upon any such assignment, CW will be discharged from all liability hereunder.

   1.10. While this Agreement is in effect and for a period of six months after this Agreement ends, both parties agree not to solicit or offer employment to any of the other's current employees or anyone who has left either party's employment in the last 90 days. In the event that a breach of this covenant occurs, the breaching party agrees to pay, as liquidated damages, a sum of money equal to 100% of the employee's annual wages for each such breach.

   1.11. Client acknowledges and agrees that the terms of this Agreement and the relationship of the parties under this Agreement are confidential. Neither party may disclose them without the other's consent unless required to do so by law or an official authority. This obligation continues after this Agreement ends.

   1.12. All notices or other communications, except for service of process, must be in writing and shall be deemed duly given if delivered in person, or by a nationally-recognized commercial delivery service.



1.13. This Agreement shall be interpreted under the laws of the jurisdiction in which the Center is located.  CLIENT HEREBY EXPRESSLY AND KNOWINGLY WAIVES ANY AND ALL RIGHT TO A JURY TRIAL IN ANY ACTION OR SUIT ARISING OUT OF THIS AGREEMENT OR THE PERFORMANCE OR NON-PERFORMANCE HEREOF.

1.14. Client must pay any reasonable and proper costs including legal fees that CW incurs in enforcing this Agreement.

1.15. This Agreement supersedes any prior agreement and embodies the entire agreement between Client and CW.  This Agreement is an arm's length transaction between disinterested parties.  There shall be no presumption of construction against the drafter of this Agreement.

1.16. Client and CW acknowledge and agree that neither Landlord, nor Landlord's agent, are parties to this Agreement and neither of them shall have any contractual liability or duty to Client by virtue of this Agreement, and that this Agreement shall not affect the rights and obligations between CW and Landlord.


2.  **USE AND OCCUPANCY:**

2.1. Client agrees to use and occupy the Office solely for general office purposes. Client will only conduct business in the name as stated on the first page of this Agreement or some other name that CW has previously approved in writing.

2.2. Client agrees to comply, at its expense, with all applicable laws, orders, regulations and rules, pertaining to the use and occupancy of the Office, and the conduct of Client's business.  Client must conduct its business so as not to interfere with the use of the Center by CW, its employees, the other clients of the Center, and the tenants of the Building and so as not to detract from the appearance of the Center.  Client must comply with CW's safety standards, with the Center Rules and Regulations attached hereto and the building's rules and regulations (copies of which are on file in the Manager's office).  Client may not cause any nuisance or annoyance, cause the increase of insurance premiums CW has to pay, or cause loss or damage to CW (including damage to CW's reputation) or to CW's Landlord.  Client acknowledges that (a) the terms of the this Section 2.2 are a material inducement in CW's execution of the Agreement and (b) any violation by Client of this Section 2.2 shall constitute a material default by Client hereunder, entitling CW to terminate this Agreement without further notice or procedure.

2.3. Client agrees to pay promptly (i) all sales, use, excise, consumption and any other taxes and license fees which Client is required to pay to any governmental authority (and, at CW's request, will provide evidence of such payment) and (ii) any taxes paid by CW to any governmental authority that are attributable to this Agreement, or the accommodations provided hereunder, including, without limitation, any gross receipts, rent and occupancy taxes, or tangible personal property taxes.

2.4. Client shall make no alterations or modifications in or to the Office, including, without limitation, affixing any signs or postings, and any door locks, without CW's prior written consent (which CW may grant or withhold in its sole discretion).  In the event that alterations or modifications are made without CW's prior written consent, CW may, at CW's option, correct or remove the same at Client's sole cost and expense.

2.5. All keys and entry cards remain CW's property and shall not be duplicated or transferred to third parties. The loss of keys or cards must immediately be reported to CW. Client will be responsible for the cost of lost keys or cards as well as the cost of changing locks.

2.6. Client may not have any advertising of any type using the address of the Center without CW's prior written consent (which CW may grant or withhold in its sole discretion). Use of the address on business cards, websites, and other standard business practices are acceptable without written consent.

2.7. Client acknowledges that CW will comply with the USPS regulations regarding Client's mail.  Client must also comply with all USPS regulations.  Failure to comply will result in immediate termination of this Agreement.

2.8. Client shall not, without CW's prior written consent (which CW may grant or withhold in its sole discretion), store or operate any computer equipment (except personal computer equipment) or any other large business machines, reproduction equipment, heating equipment, stove, mechanical amplification equipment, vending or coin-operated machines, refrigerator or coffee equipment.

2.9. Client may not install any cabling, IT or telecom connections without CW's prior written consent (which CW may grant or withhold in its sole discretion).  As a condition of CW consent, Client will permit CW to oversee any installations (for example, IT or electrical systems) to verify that such installations do not interfere with the use of the Center by CW, other clients or Landlord.  CW's consent may also be conditioned upon the payment of additional fees for installation and/or usage of such cabling, and/or the requirement that the Client remove the cabling, etc.  All cables in the ceiling or walls of the Center shall become CW's property.

2.10. The electrical current shall be used for ordinary lighting, powering personal computer equipment and small appliances only.  If Client requires any special installation or wiring for electrical use, telephone equipment or otherwise, such wiring shall be done with CW's prior written approval, at Client's sole expense by a company approved by CW.  Client shall not install or operate any equipment or machinery that requires a separate electrical circuit or consumes higher than normal and reasonable quantities of electricity.


3.  **FEES & SERVICES**

**CARR**
WORKPLACES

3.1. All Total Monthly Fixed Fees stated on the first page of this Agreement shall remain in effect throughout the initial term, or one year from the date of this Agreement, whichever period is shorter.  Thereafter, the Monthly Office Charge will be adjusted by the percentage outlined in the section entitled "Term and Commencement of Services" on the first page of this Agreement.

3.2. All Total Monthly Fixed Fees are due in advance on the first calendar day of each month for the duration of this Agreement. All payments shall be made without deduction, offset or counterclaim. Fees for additional services are due on the first calendar day of the month after submission of the invoice to Client for additional services rendered through the 15th day (or such other period) of the previous month.

3.3. Upon Client's request to CW, during normal business hours, CW may provide additional services that are not included within the Monthly Office Charge or the Monthly Service Charge. The fee schedule for additional services is available upon request and may be updated at any time without notice. Client agrees to pay all charges listed on the first page of this Agreement as well as any additional services rendered.  CW (and CW's designated vendors) is the only authorized service providers in the Center.  If Client defaults under this Agreement, CW may cease providing any services to Client without resorting to legal process.

3.4. A late payment charge equal to 10% of the arrearage shall be due and payable if payment is not received by CW by the 5th day of the month.  The amount of the late payment charge shall be the lesser of the amount stated or the highest amount permitted by law.  In the event that Client's check is not honored because of insufficient funds, Client will pay CW a $100 fee in addition to all other remedies. In the event that Client's credit card is not honored, Client will pay a $50 fee in addition to all other remedies.  A dishonor of Client's check or credit card more than two (2) times during the term of this Agreement shall be an immediate event of default for which no additional notice or cure period shall be required.

3.5. If Client benefited from a special discount, promotion or offer, it was for the initial term only, and CW may discontinue that discount, promotion or offer without notice if Client defaults under this Agreement.

3.6. Client is required to pay a service retainer equivalent to the amount stated on the first page of this Agreement.  No interest will be paid on the retainer.  This retainer will be held by CW as security for performance of all Client's obligations under this Agreement.  If Client fails to perform any of its obligations under this Agreement, CW may apply Client's retainer to the balance due CW and any expenses or liabilities incurred by CW and Client agrees to replenish any portion CW applies. CW may increase the amount of Client's retainer if Client is in arrears in the payment of invoices. The retainer or any balance, after deducting outstanding fees, restoration fees and other costs due to CW, will be returned to Client after Client have settled its account to the address Client has provided to CW.  In the event no address has been provided and any portion of Client's retainer is not claimed after 120 days, it will be automatically forfeited to CW.

4. **IT SERVICES AND SUPPORT**:

4.1. Client is responsible for ensuring that Client has adequate protection against viruses through the use of its own virus protection on its systems and hardware, and Client is expected to keep the software current with the latest virus definition files.

4.2. Client is prohibited from engaging in any violations of system or network security.  Internet access may not be used in connection with attempts – whether or not successful – to violate the security of a network, service or other system.  Examples of prohibited activities include, without limitation: hacking, cracking into, monitoring or using systems without authorization, scanning ports, conducting denial of service attacks, and distributing viruses or other harmful software. CW may disconnect Client's equipment and withhold services if CW determines that Client's hardware or software is, or has become, inappropriate for connection to CW's network or otherwise violates this provision.

4.3. Staff time spent on prohibited activities or policy violations can be initiated at Client's expense on an emergency basis without Client's permission and without an estimate or limit. CW will make a good faith effort to minimize the amount of billable time CW spends on an emergency basis. If CW is diagnosing a problem reported by another customer and find that the problem is caused by Client, Client will be billed for the time spent diagnosing that problem.

4.4. Client agrees not to perform any illegal or inappropriate uses identified by CW's network administrator.

4.5. Client's IT equipment or host servers can be co-located within CW's data room (as space permits) at a monthly fee per device. Client agrees to coordinate the removal of its IT equipment from the data room upon termination or expiration of this Agreement. Access to equipment that is co-located in CW's IT room is available during normal business hours. For security reasons, an employee or IT staff person of CW must supervise Client while Client is in CW's IT room and applicable charges will apply.

4.6. If Client uses excessive amounts of bandwidth or abuses the use of the shared network, Client will be notified and additional charges for high bandwidth usage will apply.

4.7. Client may connect Wireless Access Points to the network jacks in Client's Office upon CW's prior approval but such Wireless Access Points may not be used primarily as a means to circumvent network jack charges. Additional fees may apply.

4.8. Internet connectivity provided cannot be used for VoIP service without CW's prior written approval.

5. **DEFAULT AND TERMINATION**:

**CARR**
WORKPLACES

5.1.  CW may terminate this Agreement immediately by giving Client notice and without need to follow any additional procedures if: (a) Client becomes insolvent, bankrupt, goes into liquidation or becomes unable to pay its debts as they become due, or (b) Client is in breach of one of Client's obligations under this Agreement which cannot be cured or which CW has given Client notice to cure and which Client has failed to cure within five (5) days of such notice, or (c) Client's conduct or that of someone at the Center, with Client's permission or invitation, is incompatible with ordinary office use.

5.2.  CW shall have the right to terminate the Agreement immediately if Client is or becomes (i) identified on the Specially Designated Nationals and Blocked Person List maintained by the U.S. Department of the Treasury Office of Foreign Assets Control or any similar list or (ii) a person, entity, or government with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation or Executive order of the President of the United States.

5.3.  If CW terminates the Agreement for any of the reasons described in the immediately preceding paragraphs, Client shall remain responsible for its outstanding obligations under this Agreement.  Client may, in addition to any other obligations contained herein, be required to:

- Pay for additional services Client has used;
- Pay the Monthly Office Charge for the remainder of the period for which Client's agreement would have lasted had CW not ended it, or for a further period of three months, whichever is longer; and,
- Forfeit Client's Retainer.

In such event, CW may also take possession of the Office.

5.4.  A waiver by either CW or Client of a breach (or series of breaches) of any covenant or obligation under this Agreement of the other party shall not be construed to be a waiver of any other covenant or obligation or of any subsequent breach of the same covenant or obligation.  Notwithstanding the CW's reservation of any particular remedy hereunder, CW hereby reserves each and every remedy available at law or in equity in the event of a breach by Client hereunder.

5.5.  Client agrees that if Client is in default under any agreement with CW or any of its affiliates at any center other than the one specified on the front page of this Agreement, CW may recover any unpaid sums due under such other agreement from Client under this Agreement, and that CW may, in particular (but is not limited to), withhold services under this Agreement or deduct sums from the service retainer held under this Agreement in respect of such unpaid sums.

5.6.  Upon the expiration or termination of the Agreement, Client's right to occupy the Office and use the Center is revoked and Client will remove all of its property and return the Office and furniture in the same condition in which it was delivered to Client, subject to reasonable wear and tear.  Any personal property left in the Office will be considered abandoned and CW may dispose of it without any liability to Client.  All telephone and facsimile numbers are CW's property and cannot be transferred to Client at the expiration or termination of the Agreement.

5.7.  Upon Client's departure or if Client, at Client's option (with CW's prior approval), desires to relocate to a different Office within the Center, in addition to any amounts payable hereunder, a flat fee of $600 per Office will be assessed for standard office restoration and services disconnections. CW reserves the right to charge additional reasonable fees for any repairs above and beyond normal wear and tear.

5.8.  For a period of 30 days after the termination of this Agreement, CW will forward Client's mail to an address provided in writing by Client at no charge, other than the postage + a 25% handling fee, and shall place a recorded message on Client's telephone line providing Client's new telephone number, as provided by Client in writing to CW, at no charge, other than a one-time set-up fee of $15.00.  Thereafter, CW shall have no obligation whatsoever to forward mail to Client or provide phone service unless Client enters into a "recorded message" or "mail only" program pursuant to a separate agreement. In the event Client does not (i) provide CW with a forwarding address and/or new telephone number upon the expiration or earlier termination of this Agreement, or (ii) enter into a "recorded message" and/or "mail only" program after the expiration of the above-referenced 30-day period, then Client agrees that within five business days after the termination of this Agreement, Client will cease using, advertising and/or disseminating the telephone number and/or permanent business address CW provided to Client or CW will immediately demand a fee of $100.00 per week until Client ceases using such telephone number and/or permanent business address. The terms of this section shall survive the expiration or earlier termination of this Agreement.  Other than as set forth in this Section 5.7, Client releases CW from any liability arising or incurred in connection with any mail or packages received on Client's behalf.

5.9.  If Client continues to occupy the Office after this Agreement has ended, Client will be responsible for any loss, claim or liability CW incur as a result of Client's failure to vacate on time.  CW may, at CW's discretion, permit Client an extension subject to a surcharge on the Monthly Office Charge.

5.10. If the Center is made unusable in whole or in part by fire or other casualty or condemnation, CW may, at CW's option, either terminate this Agreement upon notice to Client, or repair the Center.  In such event, the Monthly Fees shall be abated on a per diem basis with respect to the portions of the accommodations that are unusable or not provided, which will be Client's sole remedy.


**6.  LIABILITY:**


6.1.  To the maximum extent permitted by applicable law, CW is not liable to Client in respect of any loss or damage Client suffers in connection with this Agreement or in connection with the services or the accommodations unless CW has acted deliberately or

**CARR**
WORKPLACES

negligently in causing that loss or damage. CW is not liable for any loss or damage as a result of CW's failure to provide any service under this Agreement as a result of mechanical breakdown, strike, termination of CW's Lease, or otherwise, unless CW does so deliberately or is negligent in connection therewith. In no event will CW be liable for any loss or damage until Client provides CW with written notice and gives CW reasonable time to cure. If CW is liable for failing to provide Client with any service under this Agreement, then subject to Section 6.2 below, CW will pay any actual and reasonable expenses Client incurred in obtaining that service from an alternative source up to a maximum equal to 125% of the total fees paid between the date Client executes this Agreement and the date on which the claim in question arises, or $100,000, whichever is higher. If Client believes CW has failed to deliver a service consistent with this Agreement, Client can provide CW written notice of such failure and give CW a reasonable period of time to cure such failure.

6.2. CW WILL NOT UNDER ANY CIRCUMSTANCES HAVE ANY LIABILITY FOR LOSS OF BUSINESS, LOSS OF PROFITS, LOSS OF ANTICIPATED SAVINGS, LOSS OF OR DAMAGE TO DATA OR ANY CONSEQUENTIAL DAMAGES.

6.3. Client assumes all risk of loss with respect to Client's personal property and Client's agents, employees and invitees within the Center or the building. During the term of this Agreement, Client will maintain with a respectable insurer licensed to do business in the state and subject to CW's approval (a) all risk property insurance covering Client's property and (b) comprehensive general liability insurance of no less than $1,000,000, with CW, the Landlord and any other parties designated by CW named as additional insured. Client will deliver certificates of insurance to CW evidencing such coverage prior to the commencement of this Agreement and any expiration date of such policy.

6.4. To the extent that the party sustaining a loss by fire or other casualty to its property is compensated by insurance, CW and Client will each waive all rights of recovery against the other party and no third party shall have any right of recovery.

6.5. Notwithstanding any term to the contrary, CW shall not be held liable to Client under this Agreement if CW is prevented from, or delayed in, performing CW's obligations under this Agreement or from carrying on CW's business by acts, events, omission or accidents beyond CW's reasonable control, including (without limitation): strikes, failure of a utility service or network; act of God, war, riot, civil commotion, disease or quarantine restrictions in compliance with any law or governmental rule, regulation or direction, accident, fire, floor or storm or default of suppliers or subcontractors. CW's obligation to perform its obligations under this Agreement shall be suspended during the period required to remove such force majeure event.

6.6. To the fullest extent permitted by law, Client agrees to hold CW, its agents, employees, contractors, officers, directors and Landlord harmless from and against any and all claims of loss, costs, liability and expense, including reasonable attorneys' fees and disbursements (the "Claims"), arising from or alleged to arise from (a) any default by Client hereunder, (b) the use or occupancy of the Center by Client or any person claiming under Client, (c) Client's negligence or the negligence of Client's agents, employees, contractors, officers or directors, except to the extent such Claim results from CW's gross negligence or willful misconduct. To the fullest extent permitted by law, CW agrees to hold Client, its agents, employees, contractors, officers and directors harmless from and against any and all Claims arising from or alleged to arise from CW's negligence or the negligence of CW's agents, employees, contractors, officers or directors, except to the extent such Claim results from Client's gross negligence or willful misconduct, and excluding any damage or loss to personal property of Client. The foregoing indemnifications shall survive the expiration or termination of the Agreement.

# Center Rules and Regulations

Client agrees to comply with the following Center Rules and Regulations:

1.  Noise levels shall be conducive to a professional environment and shall not interfere with or disturb other clients.
2.  Neither Client nor its employees, agents, representatives or invitees shall participate in any type of harassing or disruptive behavior, whether verbal or physical, in the Center or within the building.
3.  Client and Client's guests shall conduct themselves in a businesslike manner.
4.  Canvassing, soliciting and peddling in the Center or building are prohibited and Client shall not solicit other clients for any business or other purpose without CW prior written approval.
5.  Professional attire must be worn at all times.
6.  Cell phone use is not permitted in the halls, reception area, cafés, or any other common area.
7.  Common areas, including the conference rooms, kitchen and reception area, are for the use of all clients.  Client is required to leave these areas clean after each use.  Client is responsible for their own dishes and disposal of garbage.
8.  Client is prohibited from conducting meetings in any common areas, cafes, or vacant offices, other than reserved conference rooms or day offices.
9.  The café cannot be used as a substitute or additional office or workstation for Client or Client's guests.  Working in the café for more than 10 hours per month is prohibited. This courtesy is only extended at your home center.
10. All corridors, halls, elevators & stairways shall not be obstructed or used for any purpose other than normal egress and ingress.
11. Plumbing, fixtures and appliances shall be used only for the purposes for which designed, and no sweepings, rubbish, rags or other unsuitable material shall be thrown or deposited therein.  Damage resulting to any fixtures or appliances from misuse by Client or its agents, employees or invitees, shall be paid by Client.
12. Client must not conduct a mechanical business, do any cooking, or use or allow the following to be used:  oil burning fluids, gasoline, kerosene for heating, warming or lighting.  No article deemed hazardous on account of fire or any explosive shall be brought in the Center.  No offensive gases, odors or liquids are permitted.
13. Movement in or out of the building of furniture, office equipment, bulky material, merchandise or materials which require use of elevators or stairways, or movement through the Building entrances or lobby, will be conducted under CW's supervision at such times and in such a manner as CW may reasonably require.  Client is liable for all damages including the articles moved, CW's equipment & property, and injury to anyone engaged or not engaged in such movement, including CW personnel.
14. Before leaving the office unattended, Client will close and securely lock all doors.  Any damage resulting from failure to do so will be paid by Client.
15. No advertisement, identifying signs, personal items or artwork or other notices shall be inscribed, painted or affixed on any part of the corridors, doors, office windows, common areas or cubicles without CW prior written approval.
16. Client cannot prop open any corridor doors, exit doors or doors connecting corridors during or after business hours.
17. Client cannot modify existing locks or install additional locks or bolts of any kind on any of the doors or windows of any offices or within the Center.
18. CW is not responsible for lost or stolen personal property, money or jewelry from Client's office or public or common areas regardless of whether such loss occurs when the area is locked against entry or not.
19. Client will not conduct any activity within the Center or building, which in CW's sole judgment or the judgment of Landlord, will create excessive traffic or is inappropriate to a shared office environment.
20. If Client occupies a cubicle(s) in view of any common areas, Client is required to keep the areas clear.  All boxes and filing cabinets should be stored in an orderly fashion and out of view of the common area.
21. This is a non-smoking facility and smoking is prohibited everywhere within the Center.
22. No alcoholic beverages are permitted on the premises, without CW's prior approval.
23. Conference Room hours included on the first page of your Agreement are for use at you home center, and can be used on occasion at other centers within the CW portfolio. No free hours can be used in any Manhattan location and a you may only use up to 50% of your free monthly hours in CW San Francisco locations. Restrictions apply to the type of rooms available for use. Please check with a team member prior to booking for clarification
24. Illegal firearms and weapons are prohibited.

CW has no responsibility to Client for the violation or non-performance by any other clients of any of these Rules and Regulations or the Terms & Conditions, but shall use reasonable efforts to uniformly enforce all Rules and Regulations and Terms & Conditions.



# GUARANTY

Richard Sands  ("Guarantor"), as an equity owner of Ponderosa Energy LLC ("Client") irrevocably and unconditionally guarantees to  PBC 745 Fifth Avenue, LLC, (DBA Carr Workplaces) ("CW"), the full and due performance by the Client and by its successors and assigns, of all the terms, obligations, covenants and agreements under the Agreement attached hereto (the "Agreement"), and each of them, on the part of Client to be observed or performed, and without limiting the foregoing, the full and punctual payment by Client of all Monthly Office Charges, Monthly Service Charges, and other sums of money, as and when they become due and payable by Client, as provided in the Agreement, during the full term of the Agreement.  Capitalized terms but not used herein shall have the meanings given such terms in the Agreement.

The undersigned waives notice of acceptance of this Guaranty, and agrees that this Guaranty shall be a continuing obligation of Guarantor and further agrees as follows:

1.  Notice of any and all defaults on the part of Client is waived, and consent is given to all extensions of time, waivers or indulgences of any kind, that CW may grant to Client with reference to the performance by Client of any of the terms, obligations, covenants or agreements in or under the Agreement.  Full consent is also given by the undersigned to any and all changes, modifications or amendments in, of or to any such terms, obligations, covenants or agreements as well as to conditions of, in or under the Agreement that may be made by agreement between CW and Client or otherwise; and the undersigned waives any and all requirements whatsoever on the part of CW to first exhaust or pursue its, or their remedies against Client before CW shall have the right to proceed directly, and recover against, the undersigned.
2.  The undersigned, without limiting any of the foregoing provisions of this Guaranty, also waives notice of any and all changes, modifications or amendments, in, of or to the Agreement that may be agreed upon between CW and Client or that may be permitted or suffered in connection with the agreement, or the performance thereof, as well as notice of any waivers, indulgences or extensions granted or suffered by CW.  The undersigned further agrees that, notwithstanding any waivers, extensions or indulgences granted or suffered by CW, and notwithstanding any changes, amendments or modifications, in or to the Agreement, by agreement or otherwise, the undersigned shall be and remain, and is absolutely and fully liable to CW under this Guaranty.
3.  The undersigned further agrees that this Guaranty, and the obligations of the undersigned under it, shall in no way be terminated, affected or impaired by reason of the assertion by CW against Client of any rights or remedies reserved to CW pursuant to or by virtue of the provisions of the Agreement.
4.  All of the foregoing agreements of the undersigned contained in this Guaranty, and each of them shall be binding upon the undersigned, its successors and assignees, and shall inure to the benefit of CW, its successors and assigns.  The undersigned may not assign its obligations under this Guaranty without the prior written consent of CW.
5.  This Guaranty is executed by the undersigned prior to, or simultaneously with, the execution and delivery of the Agreement by CW, and to induce CW to execute and deliver the Agreement well knowing that the CW would not do so without this Guaranty.

Guarantor listed above has caused this Guaranty to be executed on this date: March 29 2017

Signature: *richard f. sands*
richard f. sands (Mar 29, 2017)

**CARR**
WORKPLACES

# ADDENDUM

This Addendum dated March 29, 2017 shall be attached to and form a part of the Office Service Agreement dated March 29, 2017 by and between, **PBC 745 Fifth Avenue, LLC,**  d/b/a/ Carr Workplaces ("CW") and **Ponderosa Energy LLC** ("Client")**.**

The following are additional provisions and/or modifications to the foregoing and annexed Office Service Agreement.  In the event of any inconsistency between the provisions of this Addendum and the provisions of the foregoing and annexed Office Service Agreement, the provisions of this Addendum shall prevail.  Except as otherwise defined herein, all capitalized terms shall have the same meaning as set forth in the Office Service Agreement.

<u>Reduction in service retainer</u>
The Retainer will be equal to one times the fixed monthly fees, for a total of $6100. However, if any monthly payment by Client is received past the due date, an additional one month retainer will be required immediately and will be retained for the duration of the Agreement.

**IN WITNESS WHEREOF,** both parties have executed this instrument by the proper persons duly authorized to do so on the day and year indicated below.

**PBC 745 Fifth Avenue, LLC,  dba Carr Workplaces**

**By:  Preferred Group, LLC, its authorized agent**

By:

Name: Gregg de los Reyes

Title:   General Manager

Date:

**Ponderosa Energy LLC**

By: *richard f. sands*
richard f. sands (Mar 29, 2017)

Name:    Richard Sands

Title:   member manager

Date:    Mar 29, 2017

*Rev 3.1.2015*



# ADDENDUM

This Addendum dated September 19, 2016 shall be attached to and form a part of the Office Service Agreement dated March 29, 2017, by and between **PBC-745 Fifth Ave, LLC**, d/b/a/ Carr Workplaces ("CW") and **Ponderosa Energy LLC** ("Client").

The following are additional provisions and/or modifications to the foregoing and annexed Office Service Agreement. In the event of any inconsistency between the provisions of this Addendum and the provisions of the foregoing and annexed Office Service Agreement, the provisions of this Addendum shall prevail. Except as otherwise defined herein, all capitalized terms shall have the same meaning as set forth in the Office Service Agreement.

<u>**Amendment to term escalation**</u>

As of October 1, 2017, this Agreement will renew for consecutive periods of three months at an adjustment of 0% of the monthly office charge, whereby either party must provide 1 full calendar month written notice of its intent to terminate, so that the end of the agreement will fall on the last day of the calendar month. This rate will remain in effect for a period of no longer than 12 months. In the Event that the term of the renewal agreement is extended beyond this 12 month period, the monthly office charge will increase by 10 % every 12 months starting October 1, 2018.

**IN WITNESS WHEREOF,** both parties have executed this instrument by the proper persons duly authorized to do so on the day and year indicated below.

**PBC-745 Fifth Ave, LLC, dba Carr Workplaces**
**By: Preferred Group, LLC, its authorized agent:**                    **Ponderosa Energy LLC**

By: *Gregg de los Reyes*                                                By: *richard sands*
Gregg de los Reyes (Sep 19, 2017)                                        richard sands (Sep 19, 2017)

Name:  Gregg de los Reyes                                                Name:  Richard Sands

Title:   General Manager                                                 Title:   member manager

Date:  Sep 19, 2017                                                      Date:  Sep 19, 2017

*Rev 3.1.2012*